**UNITED STATES of America on Behalf of its Agency, the SMALL BUSINESS ADMINISTRATION**

v.

**Morris I. KURTZ.**

**Civ. A. No. 76–313.**

United States District Court,
E. D. Pennsylvania,
Civil Division.

Oct. 29, 1981.

736

Peter F. Vaira, U. S. Atty., James G. Sheehan, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Wilbur Greenberg, Sidkoff, Pincus, Greenberg & Green, P.C., Albert J. Olizi, Jr., Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. Introduction

This action, brought by the United States to enforce the guaranty on a defaulted $400,000.00 loan made under the Small Business Administration (SBA) loan guaranty program, is before us on the parties' cross-motions for summary judgment. We first heard argument on the Government's motion for summary judgment in early 1979, and, by order filed May 17, 1979, denied that motion without opinion. However, after defendant Morris I. Kurtz filed a summary judgment motion on April 23, 1980, the Government reinstated its motion, noting that the defendant had changed his position as to whether the case turned on issues of material fact, in contradistinction to issues of law.[1] After additional briefing, reargument, and further reflection, the summary judgment motions are now ripe for disposition.[2] For reasons that we discuss at length, we will grant the Government's motion and deny defendant's motion. We turn first to a description of the factual record before us.

### II. The Facts

On April 11, 1969, Arnold's Cleaners, Inc. ("Arnold's"), a California corporation engaged in the dry cleaning business in Los Angeles, entered into a loan agreement

---

1. We need not comment here on the extent to which defendant's current position differs from his position prior to our May 17, 1979, order, because that order is, in any event, subject to reconsideration.

2. Our delay in deciding these motions was occasioned by our involvement in the Japanese Electronic Products Antitrust Litigation, M.D.L. 189.

with the Guardian Life Insurance Company of America ("Guardian"). The loan was secured by a promissory note in the amount of $400,000.00 with interest at 8% per annum. The proceeds were used primarily to enable Arnold's to enter the industrial uniform rental business under the name Allstate Uniforms. Defendant, who was the president and sole shareholder of Arnold's, personally guaranteed the full amount of the loan. The loan package also included an undertaking by the SBA to guarantee repayment of the loan to Guardian.[3] Arnold's pledged its business machinery, fixtures, furniture, equipment, and after-acquired property as collateral for the loan. The collateral then in existence was appraised twice at the time the loan was made: once by H. B. Okey, an SBA employee, and once by an outside firm identified in the record only as "Tait." Okey valued the collateral at $237,500.00, while Tait appraised the same property at a value between $275,500.00 and $290,000.00.

Arnold's was unable to make all its required payments to Guardian between September 1969 and January 1970. On December 14, 1970, because of Arnold's continuing failure to meet its obligations as they came due, Guardian made demand on the SBA for payment of the guaranteed portion of the loan. The SBA honored Guardian's demand, and, on December 17, 1970, Guardian assigned to the SBA the right to collect from Arnold's on its note or from defendant on his guaranty.

Shortly thereafter, Arnold's filed a Petition for Arrangement under Chapter XI of the Bankruptcy Act, 11 U.S.C. §§ 701–99 (repealed Oct. 1, 1979),[4] in the United States District Court for the Central District of California, Arrangement No. 84436. The United States timely filed its proof of claim on behalf of the SBA on May 7, 1971. On June 11, 1971, Arnold's filed a Plan of Arrangement ("Plan") for approval by the court. The Plan divided Arnold's into two separate business operations, "spinning off" the uniform rental business operated under the fictitious name of Allstate Uniforms. Under the Plan, the SBA agreed to release any security interest it held in the assets of Allstate Uniforms and in after-acquired property of Arnold's, and to accept an undertaking by the reorganized debtor to assume and pay the debt owed to the SBA according to a specified schedule. The SBA retained its security interest in the assets of the diminished Arnold's dry cleaning operation.

The Plan required defendant to transfer all of his interest in Arnold's to four named buyers, who were to fund the arrangement by depositing $60,100.00 in escrow with the receiver. The Plan fixed the sum payable by the reorganized debtor to the secured creditors[5] at $379,112.32, plus 6% interest per annum on the unpaid balance from the date of confirmation.[6] The Plan further provided that the creditors would be paid in monthly installments equal to the greater of one half of the net profits earned by the

---

**3.** The SBA contends that it agreed to guarantee 90% of $400,000.00; defendant asserts that the SBA guaranteed only 87½% of $350,000.00. This discrepancy is irrelevant to the determination here of the amount of defendant's liability because Kurtz guaranteed the entire $400,000.00 loan. Neither the Government nor defendant has suggested that the discrepancy creates a question as to whom the defendant is liable, though we note that in 1971 at the time of Arnold's reorganization under the Bankruptcy Act, the SBA held jointly with the Imperial Bank of Los Angeles, California, a note in the amount of approximately $379,000.00, which represented the then current balance of the $400,000.00 loan. In the absence of any contrary representations by defendant, we accept the Government's implicit position that it is

entitled to collect the full amount defendant is found to owe under the guaranty.

**4.** Subsequent references to provisions of the Bankruptcy Act are to the old act, unless otherwise indicated.

**5.** The secured creditors included the SBA and Imperial Bank. *See* note 3 *supra.* We will make no further reference to Imperial Bank as joint secured creditor with the SBA because neither the Government nor defendant place any significance on Imperial Bank's role in the bankruptcy reorganization. No information has been offered as to any present interest Imperial Bank may have in Arnold's note or defendant's guaranty.

**6.** The Plan was confirmed on October 28, 1971.

reorganized Arnold's and the amount fixed by a specified payment schedule, until the balance was paid in full. According to defendant's affidavit, the Plan ultimately was accepted by the court and by Arnold's creditors, including the United States, over defendant's "most strenuous objection."

The reorganized debtor made payments totalling $1,750.00 to the SBA between December 1971 and April 1972. In the latter month the reorganized debtor ceased operations; it made no further payments to the SBA. Arnold's assets were liquidated by sale at auction, without notice to defendant, in November 1972. From the proceeds, the sum of $7,867.88 was credited to Arnold's account with the SBA. On May 8, 1975, on the basis of the guaranty executed in 1969, the SBA made written demand on defendant[7] for payment of the deficiency. Defendant failed to pay, and on February 3, 1976, the United States filed this suit on behalf of the SBA.

In the guaranty that he executed in his personal capacity, defendant agreed to make whole the lender on the event of Arnold's default. The guaranty contract provided that defendant "unconditionally" guaranteed payment of principal and interest according to the terms of the loan agreement, and that defendant would pay the amount due and owing "immediately" on written demand. Further, defendant by the agreement granted to the lender full discretion to deal with the collateral, without notice to him, including power to modify, extend, or excuse terms of the promissory note. The guaranty contract gave the lender the following powers:

> To consent to the substitution, exchange, or release of all or any part of the collateral, whether or not the collateral, if any, received by Bank upon any such substitution, exchange, or release shall be of the same or of a different character or value than the collateral surrendered by Bank;
>
> In the event of nonpayment when due, whether by acceleration or otherwise, of any of the Liabilities, or in the event of default in the performance of any obligation comprised in the collateral, to realize on the collateral or any part thereof, as a whole or in such parcels or subdivided interests as Bank may elect, at any public or private sale or sales, for cash or on credit or for future delivery, without demand, advertisement or notice of the time or place of sale or any adjournment thereof (the undersigned hereby waiving any such demand, advertisement and notice to the extent permitted by law), or by foreclosure or otherwise, or to forbear from realizing thereon, all as Bank in its uncontrolled discretion may deem proper, and to purchase all or any part of the collateral for its own account at any such sale or foreclosure, such powers to be exercised only to the extent permitted by law.
>
> The obligations of the undersigned hereunder shall not be released, discharged or in any way affected, nor shall the undersigned have any rights or recourse against Bank by reason of any action Bank may take or omit to take under the foregoing powers.
>
> . . . .
>
> The undersigned shall have no right of subrogation whatsoever with respect to the Liabilities or the collateral unless and until Bank or SBA shall have received full payment of all the Liabilities.
>
> The obligations of the undersigned hereunder, and the rights of Bank in the collateral, shall not be released, discharged or in any way affected, nor shall the undersigned have any rights against Bank . . . by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of Bank.
>
> . . . .
>
> The undersigned further agrees that all liability hereunder shall continue not-

---

7. Defendant had since moved his residence to Elkins Park, Pennsylvania.

withstanding payment by SBA under its Guaranty Agreement to Bank.[8]

### III. *The Contentions of the Parties*

The SBA urges that it is entitled to summary judgment because defendant's guaranty was conditioned only on the debtor's default and the making of a written demand for payment, and these two conditions have been fulfilled. Defendant, raising four major affirmative defenses, asserts that he, and not the Government, is entitled to summary judgment. He contends first that this action is barred by the four-year California statute of limitations. Cal.Civ. Pro.Code § 337(1). Second, he characterizes the SBA's participation in the Chapter XI proceedings as an undertaking to look solely to the reorganized debtor for repayment of the loan, so that the Government is estopped from suing on the guaranty. Third, he maintains that the Plan confirmed by the bankruptcy court in October of 1971 constituted an accord and satisfaction of the original obligation of Arnold's to the SBA, so that the guaranty accompanying the original note is without continuing legal effect. Finally, he argues that even if the Government's action is not time-barred and even if the guaranty is otherwise enforceable, the SBA did not dispose of Arnold's assets in a "commercially reasonable" manner as required by the Uniform Commercial Code, Cal.U.Com.Code § 9504. He insists that if the SBA had obtained the reasonable value of the collateral by sale, the full amount of Arnold's remaining obligation would have been realized.[9]

To these defenses, the Government replies that the suit was filed within the six years allowed by the federal statute of limitations, 28 U.S.C. § 2415, but that even if California rather than federal law applies to this issue, the suit was timely filed. Second, the Government asserts that the Chapter XI proceeding did not alter in any way defendant's obligation as guarantor of the loan to Arnold's. Finally, the Government disputes defendant's conclusion that the California Uniform Commercial Code applies to this case, but argues also that the SBA's actions conformed to its requirements.

### IV. *Discussion*

### A. *Statute of Limitations*

■ Defendant contends that this action, which was filed on February 3, 1976, is time barred because California law prescribes a four-year limitation period. Cal.Civ.Proc. Code § 337(1). The Government counters that the applicable statute is federal, so that the limitation period is six years. 28 U.S.C. § 2415. The parties also disagree about the date on which the cause of action accrued,[10] but our disposition of the choice

---

**8.** Included among the documents filed with Defendant's Motion for Summary Judgment on April 23, 1980, are the Authorization Approving Insurance Company's Request for SBA Guaranty, Guaranty Agreement (between SBA and Guardian), Loan Agreement, Note, Supplement to Loan Agreement and Note, Kurtz Guaranty, and Pledge Agreements. All of these documents except the Supplement and Pledge Agreements were SBA standard forms. Also filed were documents related to the bankruptcy proceeding in 1971: Proof of Claim of the United States of America, Plan of Arrangement, Interlocutory Order of Confirmation, and Final Order of Confirmation.

**9.** Defendant has listed numerous other affirmative defenses and elements of cross-claims and counterclaims, but neither briefed nor argued them. We consider these claims and defenses abandoned and do not address them in this opinion.

**10.** Defendant argues that the cause of action accrued when Arnold's first failed to make timely payments to Guardian, so that the action is barred even under the federal statute of limitations. He states in Paragraphs 6 and 7 of his affidavit that between September 1969 and January 1970 Arnold's did not make all required payments, and that an agent of Guardian told him in the latter part of January 1970 that Arnold's account was in arrears. We disagree that a cause of action arose at that time, because by the terms of the guaranty Kurtz was not obliged to pay until he received a written demand from Arnold's obligee. Normally, the cause of action would not accrue until the guarantor dishonored the demand. To avoid an indefinite suspension of the statute of limitations following a default on the original loan (the necessary antecedent to guarantor's liability), some courts have held that a demand must be made within a "reasonable time" thereafter. *See, e. g., Nyhus v. Travel Manage-*

of law question makes unnecessary determination of the exact date.[11] We agree with the Government that the federal six-year statute applies.

In favor of our choosing the California statute of limitations, defendant argues that *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), and its precursors require the application of state law to determine the rights of the SBA in litigation arising from its loan transactions. *Kimbell Foods*, the most recent Supreme Court decision addressing the application of state law to federal loan programs, concerns the relative priorities of contractual liens arising from federal programs and private transactions. Justice Marshall, writing for a unanimous court, observed at the outset that "[t]his Court has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." 440 U.S. at 726, 99 S.Ct. at 1457. *See United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The Court had no difficulty concluding that federal law controlled the SBA's rights. The "more difficult task" in *Kimbell Foods*, 440 U.S. at 727, 99 S.Ct. at 1458, because no federal legislation was applicable to the issue in that case, was to articulate the federal rule. The Court's decision whether to adopt state law for that purpose or to shape a uniform nationwide rule turned on its consideration of three factors:

[the] need for a nationally uniform body of law, ... whether application of state law would frustrate specific objectives of the federal programs ... [and] the extent to which application of a federal rule would disrupt commercial relationships predicated on state law.

*Id.* at 728–29, 99 S.Ct. at 1458–59. It is these policy considerations that defendant maintains dictate resort to the California statute of limitations in the case before us.

In *Kimbell Foods*, the Court, following *Clearfield Trust*, looked to state law only after determining that no federal statute supplied the federal rule of decision. In this case, however, there is a relevant federal statute of limitations, 28 U.S.C. § 2415, which supplies the federal rule and renders recourse to state law unnecessary and inappropriate. This statute provides that

[E]very action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues.

Under *Kimbell Foods*, the federal statute is controlling and the limitations period for this action is six years.

This result is consistent with the traditional rule that the United States is not subject to local statutes of limitations unless it has consented to the application of

---

*ment Corp.*, 466 F.2d 440 (D.C.Cir.1972). Certainly a few months' delay in making a demand on defendant as guarantor would have been reasonable under the circumstances. Because such a delay would have brought this action within the limitations period, we do not find it necessary to determine precisely when the cause of action arose. It is sufficient to conclude that it would have accrued on or before May 8, 1975, when written demand was made, but not earlier than February 3, 1970.

Additionally, defendant suggests that in any case the statute began to run no later than December 17, 1970, the day that Guardian assigned Arnold's obligation to the SBA. This date is, of course, less than six years before the date this action was commenced, and we need not address this argument further. We add that although a five-year delay in making de-

mand does not suggest much diligence or alertness, it may be that, given the hope of recovery from the Chapter XI proceedings, the Government would have been justified in delaying until mid-February 1972—and if so, not even the four-year California statute would be a bar.

**11.** In addition to pressing for the choice of state over federal law, defendant presents a well reasoned argument for the choice of California law over that of the forum state, Pennsylvania, citing the Restatement (Second) of Conflict of Laws § 188 (1971). The Government does not address the choice between California and Pennsylvania law. Therefore, to the extent that state law is applicable to this case, we accept defendant's position that California's is the applicable state law.

those statutes. *See, e. g., United States v. Kellum,* 523 F.2d 1284, 1286 (5th Cir. 1975) (citing cases); *United States v. Cardinal,* 452 F.Supp. 542 (D.Vt.1978) (discussing legislative history of § 2415). In *United States v. Framen Steel Supply Co.,* 435 F.Supp. 681 (S.D.N.Y.1977), on which defendant places much reliance, the court held that the four-year statute of limitations in U.C.C. Article 2, as enacted by Congress for the District of Columbia, D.C.Code Ann. § 28:2–725, applied to actions brought by the federal government. That holding is not pertinent here because that decision turned on the enactment of the District of Columbia statute by *Congress,* rather than by a state legislature.

■ The defendant next argues that the SBA consented to the application of the four-year California statute in any action brought on the basis of the loan transaction involved here.[12] He directs us to a document entitled "Supplement to Loan Agreement and Note," which provides in Paragraph 8.4 that "[t]his agreement is being delivered and is intended to be performed in the State of California and shall be construed and enforced in accordance with the laws thereof." This Supplement was executed by Guardian and by defendant for Arnold's; although the SBA did not sign it, defendant offers evidence from the deposition of the SBA's attorney to the effect that the document was reviewed and approved by the agency without objection to the reference to California law. However, the Supplement also provides, in paragraph 7, that "[i]t is not intended that any of the terms or conditions recited herein be inconsistent with the provisions of the Small Business Act or any rules or regulations promulgated thereunder or inconsistent with any other law applicable to this transaction." In view of this "umbrella" clause, we will not construe the quoted clause of paragraph 8 as consent on the part of the SBA to be subject to the shorter four-year California statute of limitations when the federal statute sets a six-year limit.

■■ Finally, defendant contends that the Government, as Guardian's assignee, stands in Guardian's shoes and is subject to the same statute of limitations that would have applied had Guardian brought this suit. It is generally true that "assignment of a claim to the United States cannot give such claim any greater validity than it had in the hands of the assignor." *United States v. Taylor,* 144 F.Supp. 15, 17 (E.D.Pa. 1956) (Van Dusen, J.). Furthermore, if the Government acquires a claim after the statute of limitations has *already* run against the assignor, the claim is barred because it was worthless when assigned. *Guaranty Trust Co. v. United States,* 304 U.S. 126, 142, 58 S.Ct. 785, 793, 82 L.Ed. 1224 (1938); *United States v. Taylor,* 144 F.Supp. at 17. However, it is well established that if the Government is assigned a claim before the statute of limitations has expired against the assignor, the Government is thereafter subject *only* to the federal statute of limitations. *See United States v. Summerlin,* 310 U.S. 414, 60 S.Ct. 1019, 84 L.Ed. 1283 (1940); *United States v. Cardinal,* 452 F.Supp. at 543 n.1; *United States v. Taylor,* 144 F.Supp. at 17 n.8. Because Guardian assigned defendant's guaranty to the SBA before the expiration of the California limitations period, the SBA's claim is governed by the six-year federal statute.

For the foregoing reasons, 28 U.S.C. § 2415 is the statute of limitations applicable to this action. Because the cause of action accrued no earlier than February 3, 1970, *see* note 10 *supra,* the action is not time barred.

### B. *Effect of the Chapter XI Proceeding on Defendant's Obligation*

The defendant contends that the conduct of the SBA during the Chapter XI reorgani-

---

12. Although some courts have held that a government agency may adopt by contract a statute of limitations other than 28 U.S.C. § 2415, *see United States v. Framen Steel Supply Co.,* 435 F.Supp. 681, 683–84 (S.D.N.Y. 1977) (citing cases), Judge Weinfeld has expressed doubt that an agency is authorized to adopt a shorter statute of limitations than Congress has provided. *See United States v. Yale Transport Corp.,* 184 F.Supp. 42, 46 n.13 (S.D. N.Y.1960). However, we need not and do not reach this question here.

zation of Arnold's in 1971 and the nature of the arrangement to which the SBA consented bar the Government's recovery now on defendant's guaranty. We disagree.

■ At the outset, we note that the simple fact of the SBA's participation in Arnold's reorganization does not foreclose the Government's current collection efforts. At the time of the Chapter XI proceedings, the Bankruptcy Act provided that "[t]he liability of a person who is a co-debtor with, or a guarantor or in any manner a surety for, a bankrupt shall not be altered by the discharge of such bankrupt." 11 U.S.C. § 34.[13] This rule of law was made applicable to Chapter XI proceedings by Section 302 of the Act. The confirmation of the Plan of Arrangement discharged the debtor, Arnold's, on those obligations that were provided for in the Plan. 11 U.S.C. § 771. The language of the statute makes clear that although confirmation of the Plan discharged *Arnold's* debt to the SBA and transferred *Arnold's* obligation to the reorganized debtor, it did not affect defendant's liability on his guaranty.

The United States Court of Appeals for the Fifth Circuit applied this principle in a case that was similar in its facts to the case at bar. The defendant in *R.I.D.C. Industrial Development Fund v. Snyder*, 539 F.2d 487 (5th Cir. 1976), *cert. denied*, 429 U.S. 1095, 97 S.Ct. 1112, 51 L.Ed.2d 542 (1977), had guaranteed two debts owed by Sunnyhill Research and Manufacturing Company to plaintiff. Sunnyhill subsequently was reorganized in a Chapter XI proceeding. The plaintiff did not receive the full amount of the debts owing to it in that

proceeding, and thereafter brought suit against the guarantor for the unsatisfied portion of the original debt. The Fifth Circuit held that the arrangement did not diminish the responsibility of Sunnyhill's guarantors to satisfy the remaining unpaid portion of the guaranteed debts, observing:

> One of the principal purposes for obtaining a guarantor to a note is to provide an alternative source of repayment in the event that the principal obligor's debt is discharged in bankruptcy. Accordingly, the Bankruptcy Act provides that discharge in bankruptcy will not alter the liability of a guarantor.

539 F.2d at 491 (footnote omitted).

■ Characterizing the SBA's participation in the Chapter XI proceedings as an agreement to look solely to the reorganized debtor for payment of Arnold's debt and describing the SBA's subsequent demand on Kurtz as an attempt to circumvent the Bankruptcy Act and other laws under which the Plan was developed, the defendant next contends that the Government is estopped from pursuing him. Moreover, he argues, the nature of the Plan that the SBA approved demonstrates that it constituted an accord and satisfaction of the full amount of Arnold's debt. We do not find these arguments persuasive.[14]

Setting aside the question whether, or with what special qualifications, the traditional defense of estoppel will lie against the Government,[15] we do not see how the estoppel doctrine is applicable. The record before us on the motions for summary judgment does not contain any allegations of

---

**13.** The corresponding section of the current Bankruptcy Code is 11 U.S.C. § 524(e).

**14.** Our disposition of these defenses, which are based on California law, makes it unnecessary for us to decide whether the principles announced in *Kimbell Foods, see* page 740 *supra*, would dictate that state law be adopted as the federal rule of decision on these issues.

**15.** The Government asserts that because defendant has alleged no affirmative misconduct by the United States, his estoppel argument must fail. The Government relies on a line of cases holding that "estoppel requires proof of affirmative misconduct on the part of the

Government," *Yang v. Immigration & Naturalization Serv.*, 574 F.2d 171, 175 (3d Cir. 1978); that such affirmative conduct is often "outside the scope of the agent's authority" and does not work an estoppel against the United States, *Housing Auth. v. Envirohousing, Inc.*, 442 F.Supp. 1193 (M.D.Pa.1977); *American Training Serv., Inc. v. Veterans Administration*, 434 F.Supp. 988 (D.N.J.1977); and that estoppel by mere conduct or failure to act may never be invoked against the United States, *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

the basic elements of estoppel, and the defendant proffers no evidence to support such allegations. The defendant does not allege, nor does careful inspection of the record reveal, any evidence of concealment or misrepresentation of fact by the SBA, or any express or implied promise by the SBA to forgo the exercise of its rights against the guarantor.

The defendant's estoppel argument rests primarily on Section 3–606 of the U.C.C. as codified in California and on Section 2819 of the California Civil Code.[16] Defendant reads these provisions to have required the SBA to obtain defendant's consent to the Plan and to the SBA's subsequent acts, particularly the liquidation of Arnold's assets in November 1972, at pain of discharge of his obligation. This contention is frivolous. Defendant's U.C.C. argument is without merit because the guaranty that is the basis of this action is not a negotiable instrument within the meaning of Section 3104 of the California U.C.C.; therefore, Section 3606 is not applicable.[17] An estoppel defense based on Section 2819 fails for two reasons. First, that provision conflicts with the provisions of the federal Bankruptcy Act. As we have explained at page 15 *supra*, former 11 U.S.C. § 34 provided that a bankruptcy proceeding would not affect the liability of a guarantor. Second, by the terms of the guaranty, Kurtz granted to Guardian, and to the SBA as Guardian's assignee, "full power, in its uncontrolled discretion and without notice ... to

deal in any manner with the liabilities and the collateral." We think this clause incontrovertibly includes the modifications of the original debt that were made pursuant to the Plan and in the subsequent liquidation. The California courts have enforced such contractual waivers notwithstanding Section 2819. *See, e. g., Brunswick Corp. v. Hays*, 16 Cal.App.3d 134, 93 Cal.Rptr. 635 (Ct.App.1971); *Wiener v. Van Winkle*, 273 Cal.App.2d 774, 78 Cal.Rptr. 761 (Ct.App. 1969).

The defendant next contends that under California law the Plan constitutes an accord and satisfaction of Arnold's debt to the SBA. To the extent that this defense relies on Section 3606 of the California U.C.C. and Section 2819 of the California Civil Code, we reject it for the reasons set out in the preceding paragraph. These provisions simply do not provide defenses in this case. Neither are we persuaded by the California cases to which defendant directs our attention in support of his claim that his guaranty obligation has been discharged. *Durgin v. Kaplan*, 68 Cal.2d 81, 65 Cal.Rptr. 158, 436 P.2d 70 (1968), and *Zellner v. Lasky*, 13 Cal.App.3d 787, 91 Cal. Rptr. 810 (Ct.App.1970), each involved a corporate reorganization in which a creditor accepted equity securities in full satisfaction of the obligation to him. When the securities subsequently declined in value, the creditors sought to recover the balance of the original debt from the guarantors. The *Durgin* and *Zellner* courts held that

**16.** Section 3606 provides in pertinent part:
(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder
(a) without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person, except that failure to delay in effecting any required presentment, protest or notice of dishonor with respect to any such person does not discharge any party as to whom presentment, protest or notice of dishonor is effective or unnecessary; or
(b) unjustifiably impairs any collateral for the instrument given by or on behalf of the

party or any person against whom he has a right of recourse.
Cal.U.Com.Code § 3606.
Similarly, Section 2819 provides:
A surety is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal in respect thereto, in any way impaired or suspended.
Cal.Civ.Code § 2819.

**17.** We assume for the purposes of discussion that the technical distinction between guarantors and sureties does not affect this case.

these actions were barred, reasoning that a creditor who chooses securities in lieu of cash voluntarily gambles that the debtor corporation will recover and that the securities will appreciate in value. The California courts declined to make guarantors insurers of the creditor's gamble.

These cases are inapposite to the facts before us. The SBA did not voluntarily choose to take either cash or securities in satisfaction of Arnold's debt, but retained its security interest in Arnold's assets. Indeed, defendant has adduced no evidence that the SBA accepted any securities during the Chapter XI proceedings. Defendant originally so alleged, but now concedes that the stock was transferred through an escrow agent to the four individuals who became shareholders in the reorganized debtor. Plainly, the Plan did not contemplate that Arnold's obligation to the Government would be extinguished, but merely transferred from the original to the reorganized debtor.

Defendant alleges that the four new owners were handpicked by the SBA, which thereby obtained a benefit. No evidence was offered to that effect, but even if this contention is accurate, we fail to see its relevance. One purpose of reorganization proceedings, like other proceedings in bankruptcy, is the protection to the extent possible of creditors' interests. Moreover, the bankruptcy court in which the Plan was filed had exclusive jurisdiction over the debtor and his property, and exclusive authority to confirm arrangements. 11 U.S.C.

§§ 761–772. For the foregoing reasons, we reject defendant's accord and satisfaction defense.

## C. SBA's Obligation to Kurtz Under the Guaranty Agreement: The "Commercial Reasonableness" Argument

■ Finally, defendant asserts that the Government cannot collect from him on the guaranty because the SBA failed to notify him prior to its sale of the collateral and failed to dispose of the collateral in "a commercially reasonable manner," as required by Section 9504(3) of the California U.C.C. The Government replies, first, that state law is inapplicable here, and second, that defendant's guaranty is "unconditional" so that he cannot raise these defenses even if otherwise they would be available.

■ Choosing the rule of law that governs defendant's rights as guarantor would be more difficult than was finding the applicable statute of limitations, for no federal statute supplies the substantive rule, see page 11 supra, but we conclude that it is unnecessary for us to do so. We assume, without deciding, that the principles announced in Kimbell Foods would require that California law be adopted as the federal rule of decision.[18] We find, however, that defendant's claims based on the Government's disposition of the collateral are insufficient as a matter of law.

The California Uniform Commercial Code provides:

18. Since the Supreme Court decided Kimbell Foods, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), a number of federal courts have considered whether the federal rule for construing SBA guaranty agreements incorporates "nondiscriminatory state laws," id. at 740, 99 S.Ct. at 1465, or some other federal common law rule. The majority have concluded that, at least where the pertinent statute is the U.C.C. as adopted by a particular state, the federal rule incorporates state law. See, e. g., United States v. Public Auction Yard, 637 F.2d 613, 615 (9th Cir. 1980); In Re Murdock Mach. & Eng'ring Co., 620 F.2d 767, 772–73 (10th Cir. 1980); United States v. Irby, 618 F.2d 352, 355 (5th Cir. 1980); cf. United States v. Willis, 593 F.2d 247, 252–54 (6th Cir. 1979) (same result in case decided prior to Kimbell Foods).

The Government argues that we should fashion a uniform federal rule for interpreting SBA standard form guaranty agreements. A uniform rule is desirable, according to the Government, because identical agreements are used throughout the United States; economical and efficient administration is a central objective of the SBA, which operates at a higher risk than other lenders; and application of a federal rule here would disrupt no commercial relationships based on state law, for no third parties are involved. Though these arguments are appealing, they apparently were rejected by the Supreme Court in Kimbell Foods. See 440 U.S. at 733, 736–37, 99 S.Ct. at 1455, 1462–63 (because loan applications are individually evaluated, agency easily can adjust transaction to reflect special risk and state law).

A sale or lease of collateral may be as a unit or in parcels, at wholesale or retail and at any time and place and on any terms, provided the secured party acts in good faith and in a commercially reasonable manner. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the secured party must give to the debtor . . . and to any other person who has a security interest in the collateral and who has filed with the secured party a written request for notice . . . , a notice in writing of the time and place of any public sale or of the time on or after which any private sale or other intended disposition is made.

Cal.U.Com.Code § 9504(3). This provision is the heart of Kurtz's defense, for he maintains that he was not notified of the sale of Arnold's assets, and that the sale was not conducted in a commercially reasonable manner. The California courts have not determined whether a secured creditor owes any duty to a guarantor under this statute, which speaks only of the secured party, the debtor, and other persons having a security interest in the collateral. However, there is considerable authority in other jurisdictions for extending to guarantors the protections afforded debtors by Section 9–507 of the U.C.C. *See, e. g., United States v. Willis,* 593 F.2d 247, 255 (6th Cir. 1979); *First Nat'l Park Bank v. Johnson,* 553 F.2d 599, 601 (9th Cir. 1977); *Fedders Corp. v. Taylor,* 473 F.Supp. 961, 976 n.11 (D.Minn.1979) (citing cases). In other settings, California courts have extended debtors' statutory rights to guarantors. *See Credit Managers Ass'n v. Superior Ct.,* 51 Cal.App.3d 352, 124 Cal.Rptr. 242 (Ct.App.1975); *Union Bank v. Brummel,* 269 Cal.App.2d 836, 75 Cal.Rptr. 234 (Ct.App.1969). Additionally, we think that measurable reliance by a guarantor on the existence of collateral as an inducement to execute the guaranty, in combination with a guarantor's rights, may bring the guarantor within the class of persons that has an interest secured by the collateral. We conclude that guarantors may raise defenses based on Section 9504(3) in collection actions like this one.

The next question to be addressed is whether a guarantor may waive by contract the protections afforded by the statute. Section 9501 plainly bars such a waiver by the debtor,[19] Cal.U.Com.Code § 9501(3)(b), but some courts interpreting Section 9–501 of the U.C.C. have concluded that that section constrains only the debtor and the secured creditor. *See First Nat'l Park Bank v. Johnson,* 553 F.2d at 602 (neither language nor policy of Article 9 requires proscription of waiver by guarantor). Other courts have reached the opposite conclusion. *See United States v. Chatlin's Dep't Store, Inc.,* 506 F.Supp. 108, 112 (E.D.Pa.1980); *cf. State Bank v. All-American Sub, Inc.,* 289 N.W.2d 772, 779 (N.D.1980) (citing cases).

A series of cases, involving actions by the United States to recover on SBA loan guarantees and construing language like that found in the contract executed by defendant, allows such contractual waivers. These cases preclude defenses based on actions by the secured creditor that are detrimental to the guarantor's interests by finding that the guaranty is "unconditional." The theory underlying these cases is that when a guarantor consents to release, substitution, or modification of the collateral by the secured creditor, it cannot fairly be said that the guarantor has relied on the collateral as an inducement to sign the guaranty. Therefore, he has agreed to be absolutely liable. *See United States v. Southern Cycle Accessories, Inc.,* 567 F.2d 296 (5th Cir. 1978); *First Nat'l Park Bank v. Johnson; United States v. Bertie,* 529 F.2d 506 (9th Cir. 1976); *United States v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673 (10th Cir. 1964); *cf. Fireman's Fund Ins. Co. v. Joseph Biafore, Inc.,* 526 F.2d 170 (3rd Cir. 1975) (construing private

---

**19.** Section 9501 assures the debtor of (1) notice and (2) a commercially reasonable sale or disposition of the collateral. Kurtz has raised defenses based on both assurances, but has not pressed his claim of lack of notice. Therefore we will be primarily concerned with his ability to defend on the ground that the Government's sale of Arnold's assets was not commercially reasonable.

guaranty agreement); *Bank of New Jersey v. Heine*, 464 F.2d 1161 (3rd Cir. 1972) (construing private guaranty agreement). A review of these cases will be instructive.

*Newton Livestock* involved a $120,000.00 SBA loan to Newton, which was secured by a mortgage and three guaranty agreements. After the debtor's default, the SBA foreclosed. When notified that the insurance on the mortgaged premises had lapsed, the SBA elected to be a self-insurer. The property subsequently suffered $30,000.00 in storm damage; the guarantors contended that they had been either fully or partially released from their obligations because the Government's failure to renew the insurance policy materially increased their risk. Rejecting this defense, the court stated:

> Their reliance on "equities" and general principles of law are unpersuasive because their rights and liabilities are fixed by the contracts of guaranty. The risk of the guarantors was not increased because their obligations were absolute and unconditional. By the terms of the guaranty contracts SBA could have made an entire release of the security for the loan and still have recovered from the guarantors. Lack of notice of mortgagor's default in its obligation to insure is unimportant because the guarantors expressly waived notice of any default by the mortgagor. The guarantors have failed to show the breach of any duty to them. They have no right to a credit because of the storm damage.

336 F.2d at 677.

*United States v. Bertie* was also an action against the guarantors of an SBA loan, brought to recover the balance remaining on a $250,000.00 note after the auction sale of the collateral was conducted by a trustee in bankruptcy. At that sale, the Government itself had purchased the corporate assets in which it had a security interest. The guarantors contended that the SBA bid less than a "commercially reasonable" amount and that consequently they were

released. However, the court concluded that the Government owed no duty to the guarantors in this respect, noting that "the agreement permitted the SBA to release the collateral entirely without consent of the guarantors." 529 F.2d at 507.

Similarly, in *Southern Cycle Accessories*, the Court rejected the claim of one guarantor of an SBA loan that the release of two co-guarantors should reduce her liability. To determine her rights, the court looked to the terms of the standard SBA guaranty agreement, virtually identical to that executed by defendant, which specified that the release of other guarantors would not affect a co-guarantor's liability; implied a waiver of the right to contribution; waived any right to require the creditor to bring suit against the other guarantors; and made the guarantors jointly and severally liable. By the terms of the agreement, said the court, her liability was absolute and unconditional. 567 F.2d at 298. *See also First Nat'l Park Bank v. Johnson*, 553 F.2d at 602 ("where a guaranty is unconditional, a creditor, at least absent willful or grossly negligent waste or misconduct, may recover a deficiency judgment from an unconditional guarantor without regard to the creditor's treatment of the collateral.")

The tendency of the courts to permit SBA loan guarantors to waive the protections afforded by Section 9–504(3) of the U.C.C. is complemented by the willingness of the California courts to allow guarantors to waive Civil Code protection of their security interests[20] *See, e. g., Brunswick Corp. v. Hays; Weiner v. Van Winkle.* We find the reasoning of these cases persuasive and conclude that defendant could waive protections that the law would otherwise afford him.

Reviewing in light of these principles the terms of the guaranty executed by defendant we find that defendant has made no allegations that, if proven, would bar the Government's recovery. As we described the agreement at pages 738 and 739 *supra*, the creditor is given considerable

---

**20.** We have found no California cases that discuss the ability of a guarantor to waive the protections afforded by the Uniform Commercial Code.

power over Arnold's mortgaged assets.[21] This power is exercisable at the creditor's sole discretion and without notice, and includes authority wholly to release the collateral without substitution. The only contractual limitation on this power is the provisions of the agreement between the principal debtor and the creditor. By the terms of the note, however, "the undersigned [Arnold's, by defendant] and sureties authorize the Holder [Guardian] to sell, at public or private sale, any or all collateral deposited and property pledged to secure the payment of this Note" upon default by the debtor. The note provides further that any release or indulgence by the Holder and its assigns with respect to one party or the collateral, with or without notice to other parties to the transaction, will not impair its rights with respect to any other party.

The guarantor does have rights "by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral . . . caused by the willful act or willful failure to act of Bank." But there are no allegations of such willful behavior here. We hold that Kurtz cannot raise the alleged commercial unreasonableness of the sale of Arnold's assets to defend this action.

 Before concluding, we will explain why we think that even if the SBA

had some obligation to preserve the collateral, defendant has not created a genuine issue of material fact with respect to the commercial reasonableness of the SBA's disposition of Arnold's assets.[22]

Defendant's argument about the disposition of the collateral includes both the bankruptcy reorganization and the later liquidation of Arnold's assets. Defendant complains that the Allstate Uniform "routes" were undervalued in the Plan of Arrangement. Under the Plan, $100.00 was allocated to the goodwill of Allstate Uniforms, including the routes, but defendant states, in his recently filed affidavit, that the routes were worth a minimum of $250,-000.00.[23] For several reasons, however, this asserted disparity in value and price does not create a triable issue. There is no indication that these routes were ever made collateral by the after-acquired property clause of the loan agreement, which reaches only property that would have been included initially if it had existed at the time the loan was made. The SBA loan authorization required the inclusion only of machinery, equipment, fixtures, and furniture. Moreover, if the Allstate routes were made part of the collateral, their disposition was approved by the bankruptcy court. Section

21. The creditor's broad powers derive not only from the contractual provision that the guarantor "hereby unconditionally guarantees . . . due and punctual payment when due," but also from the series of clauses that specify the creditor's rights with particularity. For this reason, we decline to follow the courts that have described the SBA loan guarantor's obligation in terms of the technical meaning of "unconditional guaranty" in suretyship law, concluding that the term signifies only that the creditor has no duty "to proceed against the principal obligor before attempting to collect from the guarantor." *United States v. Willis*, 593 F.2d 247, 254 (6th Cir. 1979); *see United States v. Chatlin's Dep't Store, Inc.*, 506 F.Supp. 108, 111–12 (E.D.Pa.1980). Consequently, in these cases the defendant guarantors were permitted to raise the defense of commercial reasonableness. With all due respect, we think that the language of the entire agreement must be read to bar this defense.

22. The burden of proving commercial reasonableness rests on the secured party, the Government, under California law. *See American*

*Business Credit Corp. v. Kirby*, 122 Cal.App.3d 217, 175 Cal.Rptr. 720 (Ct.App.1981); *Clark Equipment Co. v. Mastelotto, Inc.*, 87 Cal. App.3d 88, 150 Cal.Rptr. 797 (Ct.App.1978). The courts deciding the allocation of burdens of proof under U.C.C. § 9–504 have reached conflicting results. *See United States v. Willis*, 593 F.2d 247, 258 (6th Cir. 1979) (citing cases); 4 R. Anderson, Anderson on the Uniform Commercial Code § 9–504, at 237 (Supp.1980). However, the California rule represents the majority position, and we continue to assume, without deciding, that state law supplies the federal rule of decision.

23. We note that two types of routes are listed by defendant in his affidavit: Arnold's dry cleaning routes, which existed prior to the original loan transaction, and Allstate's routes. However, the value of the first is plainly irrelevant, because they were not made collateral for the loan.

9507(2) of the California U.C.C. provides that "[a] disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable."

▆ Additionally, merely alleging a discrepancy between the value obtained and the true value of the collateral is not sufficient to raise the question of commercial reasonableness. Section 9507(2) states that "[t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." *See also Sierra Financial Corp. v. Brooks-Farrer Co.*, 15 Cal.App.3d 698, 93 Cal.Rptr. 422 (Ct.App.1971).

Defendant also argues that the sale of the collateral, at a public auction in November 1972, was not reasonable, but he does not directly challenge the method, manner, time, place, or any other aspect of the sale. Nor does defendant make any allegations of willful misconduct by the SBA. Instead, he relies on the type of inference from price discrepancy alone that is discouraged by Section 9507(2). Defendant cites *Mercantile Financial Corp. v. Miller*, 292 F.Supp. 797 (E.D.Pa.1968), in support of the proposition that a large discrepancy between price and value raises a factual issue about whether a disposition is commercially reasonable. That case does not so hold, concluding only that a substantial discrepancy "is relevant" to such a determination. *Id.* at 801. Moreover, *Mercantile Financial Corp.* involved challenges to other elements of the disposition in addition to the price obtained, and thus differs significantly from this case.

Finally, we note that the Government's evidence that the auction sale of the collateral was sound is compelling. Indeed, apart from defendant's unsupported affidavit, none of the available estimates of the value of Arnold's assets names a figure larger than $30,000.00.[24] Uncontroverted evidence establishes that the auction was publicized through newspaper advertising and brochures, and was conducted by professional auctioneers. The Government also provided an accounting of the auction proceeds of $12,103.20, of which $7,867.88 was credited to the loan balance. These facts meet the standards of commercial reasonableness under California law. *See Personal Jet, Inc. v. Callihan*, 624 F.2d 562, 568–69 (9th Cir. 1980) (applying California law); *General Elec. Corp. v. Bo-Mar Constr. Co.*, 72 Cal. App.3d 887, 140 Cal.Rptr. 417 (1977).

V. *Conclusion*

Because defendant has failed to create a genuine issue of material fact with respect to any of his defenses and because, in the absence of a defense, the United States must prevail on the concededly unsatisfied guaranty, judgment must be granted for the United States. An affidavit recently filed by the Government fixes the sum due as of June 23, 1981, at $610,729.70, with interest accruing at the rate of $62.23 per day. Therefore, judgment will be entered in the sum of $618,695.14.[25]

---

**24.** In a March 1972 letter to the SBA, Leonard W. Block, vice-president of the reorganized Arnold's, estimated that the total value of inventory, vehicles, and office equipment was $30,000.00. Arnold's was then a going concern. After Arnold's ceased doing business, the Los

Angeles firm of Ostrin & Ostrin, professional auctioners, estimated that the total value of Arnold's assets was $12,000.00 to $13,000.00.

**25.** We have calculated the additional interest to date.