UNITED STATES of America, Plaintiff

v.

H & S REALTY CO., Defendant and Third-Party Plaintiff,

v.

KEY BANK OF CENTRAL MAINE, Third-Party Defendant,

v.

KEMPCHEN & CO., and Chase Commercial Corp., Parties-in-Interest.

Civ. No. 85–0272–P.

United States District Court, D. Maine.

Nov. 17, 1986.

Ronald E. Colby, III, Asst. U.S. Atty., Augusta, Me., for plaintiff.

Michael A. Nelson, Portland, Me., for defendant H & S Realty.

Frank G. Chapman, Lauren C. Folsom, Augusta, Me., for third-party defendant Key Bank.

M. Kelly Matzen, Barbara L. Raimondi, Auburn, Me., for party in interest Chase Commercial Corp.

GENE CARTER, District Judge.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S AND THIRD–PARTY DEFENDANT'S MOTIONS TO STRIKE AND FOR SUMMARY JUDGMENT

This case is before the Court on motions to strike and motions for summary judgment filed by Plaintiff United States of America and Third-Party Defendant Key Bank of Central Maine.[1] Parties-in-interest Kempchen & Co. and Chase Commercial Corp. have not yet filed any pleadings, motions or memoranda in connection with the pending matter. For the reasons stated herein, the motions to strike are denied and the motions for summary judgment are granted with respect to all claims except H & S Realty's Claim IV against Key Bank.

The Court of course recognizes that by order dated February 18, 1986, it has previously affirmed the Magistrate's Recommended Decision and denied Key Bank's motion to dismiss, which motion was based

---

1. This court has jurisdiction over Plaintiff's claim by virtue of 28 U.S.C. § 1345 (1982) and 15 U.S.C. § 634(b)(1) (1982); the Court has an-cillary jurisdiction over the claims of Third-Party Plaintiff H & S Realty Co.

on several of the same grounds advanced in support of these motions for summary judgment. The Court has determined, however, based on its consideration of the parties' memoranda, the evidentiary materials on this motion, and a thorough review of the relevant cases, that summary judgment is now appropriate.

## FACTUAL BACKGROUND

In February of 1980, Hamilton & Son, a Maine corporation specializing in custom metal fabrications, borrowed $500,000 from and executed a note in that amount in favor of Depositors Trust Co. of Maine, now known as Key Bank of Central Maine and referred to hereinafter as Key Bank. The loan was a deferred participation loan, a portion of which was guaranteed by the Small Business Administration (SBA). As collateral, Hamilton & Son gave Key Bank a security interest in its machinery and equipment, furniture and fixtures, inventory, accounts receivable, and contract rights. At the same time, Defendant H & S Realty (whose owner, Robert Hamilton, then owned Hamilton & Son) executed a form SBA loan guaranty covering the Key Bank loan to Hamilton & Son. As security for the guaranty, H & S Realty mortgaged to Key Bank certain premises owned by H & S Realty and leased to Hamilton & Son for use as its place of business.[2] By 1982, Hamilton & Son's president, James Donoghoe, acquired full ownership of Hamilton & Son from Mr. Hamilton.

In June 1983, after several late payments by Hamilton & Son and amid allegations by Mr. Hamilton of financial wrongdoing by Mr. Donoghoe, Key Bank declared the loan in default. The bank took possession of the premises in July of 1983, and an involuntary bankruptcy proceeding was commenced against Hamilton & Son. Key Bank obtained relief from the automatic stay and attempted to auction off Hamilton & Son as a going concern, but received no bids. Key Bank therefore requested the SBA to honor its guaranty and assigned the note and collateral papers to the SBA in November of 1983. The SBA held an auction which netted approximately $289,-000 and notified Defendant H & S Realty that it was obligated under the guaranty to pay the deficiency. H & S Realty has refused to pay and the SBA now sues for the principal sum of approximately $159,-000 plus interest and, in default of such payment, for an order of foreclosure upon the premises mortgaged by H & S Realty as security for the loan guaranty.

H & S Realty's answer raises a number of defenses to the SBA's action. Chief among these are the allegations that the SBA and/or its assignor, Key Bank, breached various duties of commercial reasonableness and good faith owed to H & S Realty in connection with the administration of the loan and the maintenance of and realization upon the loan collateral. H & S Realty has also sued Key Bank as a third-party defendant, claiming damages for similar breaches of duties of commercial reasonableness and good faith. H & S Realty also asserts a claim for damages to the mortgaged premises due to a pipe freeze-up allegedly caused by Key Bank's negligence while Key Bank was in possession of the premises pursuant to a lease assignment executed by Hamilton & Son.

Both the SBA and Key Bank have moved for summary judgment. They have also filed motions to strike certain material offered by H & S Realty in opposition to the summary judgment motions, on the ground that these materials are not admissible evidence. The Court will first dispose of the motions to strike and then will discuss the motions for summary judgment.

## MOTIONS TO STRIKE

Key Bank has moved pursuant to Fed.R. Civ.P. 12(f) to strike those portions of H &

---

**2.** Parties-in-interest Kempchen & Co. and Chase Commercial Corp. may also have interests in these premises by virtue, respectively, of a mortgage deed recorded in September of 1980 and a writ of attachment recorded in September of 1983. As Plaintiff has requested an order of foreclosure, these interests will be considered to the extent necessary when the Court issues its final judgment on Plaintiff's claim.

S Realty's materials submitted in opposition to the summary judgment motions that do not conform to the admissibility requirements of Rule 56(e). The SBA joins in the motions, without specifically relying on Rule 12(f). For the following reasons, the Court will deny these motions.

A Rule 12(f) motion applies only to "pleadings," which Rule 7 clearly differentiates from "motions and other papers." Rule 7(a) states that "[t]he rules applicable to captions and other matters of form of pleadings apply to all motions and other papers provided for by these rules," but a motion to strike is hardly a matter of form. Moreover, inadmissibility or non-compliance with Rule 56(e) is not one of the enumerated grounds for a Rule 12(f) motion.

■ The Court is, however, mindful of its obligation on a summary judgment motion to consider only those matters part of the discovery record or suggested by affidavit that would be admissible at trial. *See* 10A C. Wright, A. Miller, and M. Kane, *Federal Practice & Procedure* § 2722 & nn. 11–12, 14–15, 23, 38–39 (1983). To the limited extent to which it has been necessary to consider the evidence at all, the Court has considered the parties' contentions as to the admissibility of various items of evidence in the record and has considered only those items it finds to be admissible. There is no need at this time to rule individually on each contested item.

## COMMERCIAL REASONABLENESS

H & S Realty asserts defenses against the SBA and claims against Key Bank based on the alleged failure of both defendants to follow commercially reasonable practices in administering the loan and maintaining and realizing upon the loan collateral. (H & S Realty raises no question about, and the Court's conclusions are not meant to apply to, the lender's and guarantor's rights and duties with respect to the *guaranty* collateral.) H & S Realty's Second Defense against the SBA and its Claim I against Key Bank assert breaches of express covenants of commercial reasonableness, but H & S has acknowledged that no such express covenants exist. *See* Memorandum of Law in Support of Objection to Motion to Dismiss Third-Party Complaint at 5 (Dec. 12, 1985). Key Bank is therefore entitled to summary judgment on Claim I, and the Court finds H & S Realty's "Second Defense" to be legally insufficient.

What remains are H & S Realty's Claim II, alleging Key Bank's negligence in failing to follow commercially reasonable practices, and its Third Defense, asserting a failure by both Key Bank and the SBA to follow legally required procedures in maintaining and realizing on the collateral. (H & S Realty's Statement of Material Facts in Issue at 1 makes clear that this Third Defense essentially asserts a commercial reasonableness defense.) H & S Realty further narrows the scope of Claim II and the Third Defense by acknowledging that only *post*-default conduct is subject to the commercial reasonableness requirement of Uniform Commercial Code section 9–504(3). *See* H & S Realty's Statement of Material Facts in Issue at 1; *United States v. Mallett*, 782 F.2d 302, 304–05 (1st Cir.1986); *United States v. Cain*, 736 F.2d 1195, 1197–98 (7th Cir.1984) ("The duty to act in a commercially reasonable manner is imposed on the SBA only with respect to sale of security after default.").

The Court must therefore focus on whether either Key Bank or the SBA breached any duty of commercial reasonableness owed to H & S Realty in the period after Key Bank declared the default on June 9, 1983. For the reasons set forth below, the Court concludes that because of the waiver provisions of the guaranty,[3] nei-

---

3. The standard form SBA guaranty agreement signed by Defendant provides in part (emphasis added):
   ... the Undersigned hereby unconditionally guarantees to Lender, its successors and assigns, the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor, made by the Debtor to Lender, dated 2–26–80....

ther Key Bank nor the SBA owed H & S Realty a duty of commercial reasonableness with respect to the loan collateral during this period; the Court therefore need not consider whether there is a genuine issue of material fact with respect to the breach of such a duty.

First, the Court notes that the interpretation of the guaranty and the validity of the Third Defense against the SBA are matters of federal common law. *See* 13 C.F.R. § 101.1(d)(2) (1986). ("Instruments ... held by the administration ... such as ... guaranty agreements ... shall be construed and enforced in accordance with applicable Federal law.") In the absence of any federal law on the issue, the Court may apply Maine law if not inconsistent with federal interests. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 729, 99 S.Ct. 1448, 1459, 59 L.Ed.2d 711 (1979); *United States v. Kurtz,* 525 F.Supp. 734, 744 n. 18 (E.D.Pa.1981), *aff'd without opinion,* 688 F.2d 827 (3d Cir.1982), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982) (discussing federal common law's incorporation of state law in construing SBA loan guaranties). The relevant Maine law, of course, is article 9 of the Uniform Commercial Code, Me.Rev. Stat.Ann. tit. 11, §§ 9–101—9–507 (1964 & Supp.1985). The Court also looks for guidance to other federal courts that have decided this question by incorporating the UCC into federal common law. The Court recognizes that H & S Realty's Claim II against Key Bank appears to be governed by Maine law rather than federal common law, as 13 C.F.R. § 101.1(d)(2) was not applicable until Key Bank assigned the guaranty to the SBA. *But cf.* 13 C.F.R. § 101.1(d)(4) (1986) (stating that any person who offers any assurance or security upon which SBA relies in granting any benefit or assistance "shall not be entitled to claim or

... The *Undersigned hereby grants to Lender full power, in its uncontrolled discretion and without notice to the undersigned, but subject to the provisions of any agreement between the Debtor or any agreement between the Debtor or any other party and Lender at the time in force, to deal in any manner with the Liabilities and the collateral, including but without limiting the generality of the foregoing, the following powers:*
(a) To modify or otherwise change any terms of all or any part of the Liabilities ..., to grant any extension or renewal thereof and any other indulgence with respect thereto, and to effect any release, compromise or settlement with respect thereto;
(b) To enter into any agreement of forbearance with respect to all or any part of the Liabilities, or with respect to all or any part of the collateral, and to change the terms of any such agreement;
(c) To forbear from calling for additional collateral to secure any of the Liabilities or to secure any obligation comprised in the collateral;
(d) *To consent to the substitution, exchange, or release of all or any part of the collateral,* ...;
(e).....
The *obligations of the Undersigned hereunder shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights or recourse against Lender, by reason of any action Lender may take or omit to take under the foregoing powers.*
In case the Debtor shall fail to pay all or any part of the Liabilities when due, whether by acceleration or otherwise, according to the terms of said note, the Undersigned, immediately upon the written demand of Lender, will pay to Lender the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the Undersigned. Lender shall not be required, prior to any such demand on, or payment by, the Undersigned, to make any demand upon or pursue or exhaust any of its rights or remedies against the Debtor or others with respect to the payment of any Liabilities, or to pursue or exhaust any of its rights or remedies with respect to any part of the collateral. The Undersigned shall have no right of subrogation whatsoever with respect to the Liabilities or the collateral unless and until Lender shall have received full payment of all the Liabilities.
*The obligations of the Undersigned hereunder, and the rights of Lender in the collateral, shall not be released, discharged or in any way affected, nor shall the undersigned have any rights against Lender:* by reason of the fact ... that the value of any of the collateral, or the financial condition of the Debtor or of any obligor under or guarantor of any of the collateral, may not have been correctly estimated or may have changed or may hereafter change; nor *by reason of any deterioration, waste, or loss by fire, theft, or otherwise of any of the collateral, unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of Lender.*

assert any local immunity to defeat the obligation...." )

■ Absent the waiver provisions of the guaranty, it appears that Key Bank, as creditor, and the SBA, as Key Bank's assignee, owed H & S Realty, as guarantor, a duty of commercial reasonableness in the disposition of the Hamilton & Son collateral. Section 9–504(3) creates such a duty only to a "debtor," but the Court predicts that Maine would extend this protection to a guarantor as well. In *Camden National Bank v. St. Clair*, 309 A.2d 329 (Me.1979), the Law Court assumed without discussion that an accommodation maker was a "debtor" entitled to raise a defense of commercial reasonableness under section 9–504(3), and the status of a guarantor appears to be analogous for present purposes to that of an accommodation maker. (It is important to note that *Camden National Bank* did not discuss an accommodation maker's ability to *waive* the protections of section 9–504(3).) *But cf. United States v. Hanson*, 649 F.Supp. 100, 105–106 (D.Me.1985) (Cyr, C.J.) (doubting whether Maine law would extend to guarantors the protections accorded to mortgagors under Me.Rev.Stat. Ann. tit. 14, § 6203–E (1964)). Moreover, the majority position among other states appears to be that a guarantor is a "debtor" within the meaning of section 9–501 and is thus entitled to the protections of section 9–504(3). *See Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 1002–03 (E.D. Pa.1982) (collecting cases). Absent waiver, therefore, Key Bank and the SBA owed H & S Realty a duty of commercial reasonableness in the disposition of the loan collateral after default.

■ What is less clear is whether a guarantor may claim the protection of section 9–501(3)(b), which makes nonwaivable the commercial reasonableness requirement of section 9–504(3). Maine has not confronted the question, and other state and federal courts are split. The Court has reviewed these cases, particularly those dealing with the SBA form guaranty at issue here. The Court concludes that H & S Realty, because it manifested an intent not to rely on the debtor's collateral, may and did in fact waive its right to a commercially reasonable disposition of that collateral.

Courts upholding a waiver have offered a number of rationales distinguishing guarantors from debtors. First, the purpose of guaranty agreements is to "facilitate the issuance of loans by ensuring that the lender has a ready source from which it can collect in the event of default by the debtor. To this end, it would not be unusual for a lender to require a guarantor to waive objections to payment that otherwise might be available." *National Acceptance Co. of America v. Wechsler*, 489 F.Supp. 642, 648 (N.D.Ill.1980). Second, the guarantor is thought to have a lesser interest in the collateral than does a debtor, and thus it is not unconscionable to permit waiver by a guarantor but not by a debtor. *See id.* at 647–48. Third, there appears to be a feeling that guarantors are more likely than debtors to enter contracts with their eyes open, so that guarantors do not need the protection of section 9–501(3)(b)'s nonwaivability provision. *See First National Park Bank v. Johnson*, 553 F.2d 599, 602 (9th Cir.1977) (explaining that upholding guarantor's waiver will not deprive principal debtor of notice and commercial reasonableness protections of section 9–504(3)).

Although these arguments may have some merit, the Court finds most persuasive the rationale advanced in *United States v. Kurtz, supra*, 525 F.Supp. at 734. At issue in that case was a SBA loan guaranty nearly identical to that here at issue, which gave the lending bank the power "[t]o consent to the substitute, exchange, or release of all or any part of the collateral, whether or not the collateral, if any, received by the Bank upon any such substitute, exchange or release shall be of the same or of a different character or value than the collateral surrendered by Bank." *Id.* at 738. The guaranty, as here, went on to grant the lending bank "uncontrolled discretion" in dealing with the collateral in the event of default. *See id.*

Based on this language, the *Kurtz* court reasoned that

> when a guarantor consents to release, substitution, or modification of the collateral by the secured creditor, it cannot fairly be said that the guarantor has relied on the collateral as an inducement to sign the guaranty. Therefore, he has agreed to be absolutely liable. *See United States v. Southern Cycle Accessories, Inc.*, 567 F.2d 296 (5th Cir.1978); *First National Park Bank v. Johnson* [*supra*]; *United States v. Bertie*, 529 F.2d 506 (9th Cir.1976); *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673 (10th Cir.1964); *cf. Fireman's Fund Ins. Co. v. Joseph Biafore, Inc.*, 526 F.2d 170 (3d Cir.1975) (construing private guaranty agreement); *Bank of New Jersey v. Heine*, 464 F.2d 1161 (3d Cir.1972) (construing private guaranty agreement).

*Id.* at 745–46.

This Court finds the *Kurtz* court's reasoning persuasive. In effect, H & S Realty, as guarantor, has consented to at least two waivers here—a "release of collateral" waiver, giving Key Bank the power to consent to the substitution, exchange, or release of the collateral, and a "commercial reasonableness" waiver, giving Key Bank uncontrolled discretion in the disposition of the collateral in case of default. Thus, H & S Realty, as guarantor, has manifested an intent not to rely on the collateral pledged by Hamilton & Son as security for the underlying loan. To relieve the guarantor from its "commercial reasonableness" waiver without also relieving it from its "release of collateral" waiver might, as a practical matter, leave the guarantor unprotected. The danger to the guarantor is that the lender might release the collateral and proceed directly against the guarantor after default, while the debtor in the meantime might have acted with respect to the collateral in a manner that rendered worthless the guarantor's subrogation rights.

Matters might stand differently if the guarantor had not consented to the "release of collateral" waiver. In such a case,

even though the lender would have no duty to proceed against the collateral before seeking to enforce the guaranty, relieving the guarantor of its "commercial reasonableness" waiver would provide meaningful protection. If the lender proceeded first against the collateral, the guarantor would be in a position to insist on a commercially reasonable disposition thereof; if the lender proceeded against the guarantor, the guarantor would still have access to the collateral and thus its subrogation rights would have some value. *See Frederick v. United States*, 386 F.2d 481, 486 (5th Cir.1967); *United States v. Cawley*, 464 F.Supp. 189 (E.D.Wash.1979).

But the Court need not decide that question; the foregoing discussion is merely intended to demonstrate that, as a practical matter, a SBA guarantor such as H & S Realty would not be protected unless a court relieved it from the effect of both the "commercial reasonableness" and "release of collateral" waivers. This the Court is unwilling to do. Nothing in the record suggests that H & S Realty did not knowingly and voluntarily agree to the "release of collateral" waiver; on the contrary, the clear and unambiguous terms of the waiver plainly show H & S Realty's intent not to rely on the loan collateral in becoming a guarantor of Key Bank's loan to Hamilton & Son. *See United States v. Andresen*, 583 F.Supp. 1084 (W.D.Va.1984) (enforcing waiver of SBA guarantor's right to object to lender's subordination and release of collateral; citing cases).

Other courts have found *Kurtz* equally persuasive. *See United States v. New Mexico Landscaping, Inc.*, 785 F.2d 843 (10th Cir.1986); *United States v. Lattauzio*, 748 F.2d 559 (7th Cir.1985) (applying New Mexico UCC); *United States v. Crispen*, 622 F.Supp. 75 (N.D.Ill.1985). *See also United States v. Meadors*, 753 F.2d 590 (7th Cir.1985) (enforcing SBA guarantor's waiver without citing *Kurtz*); *United States v. Kukowski*, 735 F.2d 1057 (8th Cir.1984) (same); *United States v. Jones*, 707 F.2d 1334 (11th Cir.1983) (same); *United States v. Fisher*, 460 F.Supp. 297 (E.D.

Wisc.1978) (same). *Cf. United States v. Hanson,* Civ. No. 84–0060–B, slip op. at 9–10 (D.Me. July 2, 1985) (Cyr, C.J.).

Cases granting relief from SBA guarantors' waivers of section 9–504(3) rights are either unpersuasive or distinguishable. The case most frequently relied upon is *United States v. Willis,* 593 F.2d 247, 255–56 (6th Cir.1979). There the court held that under Ohio's UCC, the doctrine of commercial good faith protected the contractual obligation of even an unconditional SBA guarantor from the economic waste that might result from a lender's boundless discretion in the disposition of collateral. This Court has no quarrel with that proposition. But the Sixth Circuit proceeded, without explanation, from a discussion of good faith to an assertion that, despite waivers similar to those here at issue, a guarantor could raise a defense of commercial reasonableness. These are two very different standards of conduct.

Moreover, the cases the Sixth Circuit relied upon in *Willis* do not support the proposition that a guarantor may not waive the commercial reasonableness defense. The Sixth Circuit cited *United States v. Whitehouse Plastics,* 501 F.2d 692 (5th Cir.1974), *cert. denied sub nom. Baker v. United States,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975), *Dynalectron Corp. v. Jack Richards Aircraft Co.,* 337 F.Supp. 659 (W.D.Okl.1972), and *Mercantile Financial Corp. v. Miller,* 292 F.Supp. 797 (E.D. Pa.1968), yet in none of those cases did the lender assert that the guarantor had waived a section 9–504(3) defense. The Sixth Circuit also cited *United States v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673 (10th Cir.1964), yet that case actually *enforced* an SBA guarantor's waiver of a section 9–504(3) defense. The only other case relied upon by the Sixth Circuit was *United States v. Terrey,* 554 F.2d 685 (5th Cir.1977), to which this Court now turns its attention.

In *Terrey,* the court focused on two clauses of an SBA loan guaranty nearly identical to the guaranty here at issue. The first clause made the lender's powers

with respect to the collateral subject to the provisions of any agreement then in force between the lender and the debtor; the court noted that the security agreement between those two parties explicitly limited the lender to its UCC remedies. *See id.* at 692–93. The court also focused on a clause declaring that the lender's powers with respect to the collateral were "to be exercised only to the extent permitted by law." *Id.* at 693. The court assumed without discussion that the "law" referred to was the UCC and concluded that the parties "intended to limit the creditor's discretion in disposing of the collateral and to apply the same law that governed the security agreement, which they entered contemporaneously with the guaranty, to the obligation that [the guarantor] owed the bank and later the SBA." *Id.* In effect, then, the court found not that the guarantor's waiver of section 9–504(3) rights was unenforceable but that neither party had intended a waiver in the first place.

With all due respect, this Court believes that the above analysis begs the question. The two provisions just discussed ultimately have the effect of making the UCC applicable, but what does the UCC say? It establishes the *debtor's* nonwaivable right to a commercially reasonable disposition of the collateral, but whether a guarantor has such a nonwaivable right is the very question to be answered. Moreover, as a matter of contract interpretation, this Court doubts that general provisions making other law applicable were intended to negate entirely the very specific provisions granting the lender various powers as well as "uncontrolled discretion" with respect to the collateral. The connection between the two provisions in the guaranty and the UCC's nonwaivability rule for debtors is simply too tenuous.

Other cases holding that guarantors may not waive section 9–504(3) protection are similarly unpersuasive. Two such cases merely cited *Willis* and *Terrey* without engaging in any independent analysis. *See Shapex Corp. v. United States,* 629 F.Supp. 751 (M.D.Ala.1985); *United States*

*v. Chatlin's Department Store, Inc.*, 506 F.Supp. 108 (E.D.Pa.1980). The court in *Chatlin's Department Store* also cited *United States v. Conrad Publishing Co.*, 589 F.2d 949 (8th Cir.1978), in which the Eighth Circuit affirmed without discussion an unpublished district court determination that the North Dakota UCC made guarantors' section 9–504(3) protections nonwaivable. *See also United States v. Champion Sprayer Co.*, 500 F.Supp. 708 (E.D.Mich. 1980) (permitting guarantor to raise commercial reasonableness defense, where SBA did not challenge guarantor's right to raise the defense).

The only remaining federal court decision on point of which this Court is aware is *United States v. Lang*, 621 F.Supp. 1182 (D.Vt.1985). The *Lang* court offered three reasons for its conclusion, none of which this Court finds persuasive here. First, the *Lang* court interpreted a Vermont Supreme Court case as stating that guarantors had a right to notice under section 9–504(3), and on that basis the *Lang* court concluded that this right was nonwaivable. This Court sees no convincing basis for such a logical leap. Second, the *Lang* court stated that nonwaivability of guarantors' section 9–504(3) rights appeared to be the majority view in the country. *See Lang*, 621 F.Supp. at 1184 (*citing Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 1004 (E.D.Pa.1982), and cases cited therein). But this Court doubts that there is a clear majority view on the question as it deals with guaranties in general; moreover, the authorities discussed above show a trend toward enforcing the waiver in cases where the guarantor has also manifested an intent not to look to the collateral for security.

Third and finally, the *Lang* court relied in part on its view that the equities of the particular case before it called for relief from the waiver; specifically, the court noted that the guarantor deserved section 9–504(3) notice because he was merely a passive investor who resided at a great distance from the debtor and whose "sole contact with the promissory note was signing it through his power of attorney." *Id.*

at 1184. To the extent that the equities are relevant at all, *see United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673 (9th Cir.1976), (stating that "equities" are unpersuasive where the SBA guaranty clearly and unambiguously waives section 9–504(3) rights), this Court does not view the equities as clearly favoring H & S Realty's position.

Apart from the foregoing review of precedent, logic also supports the conclusion that a guarantor manifesting an intent not to rely on the debtor's collateral may waive section 9–504(3) rights. The Court recognizes that the general purpose of section 9–504(3) protection is to prevent the economic waste that would result from commercially unreasonable dispositions of collateral and/or dispositions without notice to those legally interested in that collateral. Because the debtor will most frequently be legally interested in the collateral, section 9–501(3)(b) creates a prophylactic nonwaivability rule to protect all debtors from such dispositions. In other words, the UCC through the nonwaivability rule in effect appoints the debtor, as the party with the greatest incentive to ensure a commercially reasonable disposition of the collateral, to guard against economic waste. That function being fulfilled, there is no need for a nonwaivability rule applicable to guarantors as well. This is not to say that a guarantor may not insist on proper notice and a commercially reasonable disposition of the collateral; the Court has expressed above the view that a guarantor has these rights under the Maine UCC. It is, rather, merely to say that the policies of the UCC do not require that a guarantor be prohibited from waiving these rights, at least where the guarantor has demonstrated in other ways an intent not to rely on the loan collateral.

The Court therefore grants Key Bank's motion for summary judgment on Claim II, and the Court finds H & S Realty's Third Defense to the SBA's claim to be legally insufficient.

## GOOD FAITH

In its Claim III asserted against Key Bank, H & S Realty alleges breach of an implied covenant of good faith and fair dealing in connection with the administration of the loan and the maintenance of and realization on the collateral. In its Fourth Defense raised against the SBA, H & S Realty alleges that the SBA and its agent/assignor, Key Bank, consistently and wantonly failed to follow commercially reasonable practices in administering the loan, directly causing the deficiency and amounting to bad faith barring any recovery of the deficiency by the SBA. After reviewing those portions of the record comprising or relating to evidence admissible at trial, the Court concludes that H & S Realty has not shown the existence of a genuine issue of material fact with respect to its claims of bad faith.

There is some uncertainty as to the exact source and content of the good faith standard applicable to Key Bank and to the SBA. Turning first to Key Bank, its relationship to H & S Realty is governed by Maine law. Although the Maine Law Court has not ruled on the question, this Court has previously assumed that Maine law imposes a general duty of good faith on the parties to a contract. *See Reid v. Key Bank of Southern Maine, Inc.*, Civ. No. 85–0088–P, slip op. at 5 (D. Me. Jan. 7, 1986) (Carter, J.). What is less clear is the definition of good faith that Maine would apply to the lender-guarantor relationship here at issue: the UCC standard of "honesty in fact," *see* Me.Rev.Stat.Ann. tit. 11, §§ 1–201(19), 1–203 (1964), or the *Restatement (Second) of Contracts* § 205 (1981) standard, which includes as examples of bad faith "willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract." *Id.*, comment e.

H & S Realty does not allege any actual dishonesty on the part of Key Bank or the SBA, and contends that the latter formulation applies, particularly as it relates to a party's power to determine compliance or terminate the contract. *See* Memorandum of H & S Realty Co. in Opposition to Motion of Key Bank of Central Maine for Summary Judgment at 16–19. H & S Realty seems to suggest that Key Bank's alleged failure to determine Hamilton & Son's compliance with the terms of the underlying note, and/or Key Bank's failure to "terminate the contract" earlier by declaring default, constitute bad faith toward H & S Realty. But H & S Realty has not cited, nor is this Court aware of, any case suggesting that abuse of a power to determine compliance with or to terminate a contract constitutes bad faith toward one not a party to that contract, as H & S Realty was not a party to the note executed by Hamilton & Son in favor of Key Bank. Nor has H & S Realty cited or is the Court aware of any case suggesting that *failure* to determine compliance with or to terminate a contract may constitute bad faith toward the other party to that contract or toward third parties. Similarly, the Court finds no support for the proposition that Key Bank's asserted failure to mitigate damages resulting from Hamilton & Son's failure to comply with the terms of the note could constitute bad faith toward H & S Realty, which was not a party to the note. H & S Realty makes no claim, of course, that Key Bank has failed to mitigate damages resulting from any breach of the guaranty agreement.

Common sense also supports the conclusion that the above-quoted standards of *Restatement (Second) of Contracts* § 205, comment (e), are inapplicable to the lender-guarantor relationship. If by signing a guaranty, a guarantor acquired the power to second-guess a lender's every decision in the course of administering a loan, the lender would be caught in an impossible squeeze and the very purpose of the guaranty would be seriously undermined. The Court believes that the UCC's "honesty in fact" requirement and the guarantor's right to negotiate the terms of the guaranty provide sufficient protection in this situation.

The Court therefore finds that H & S Realty's Fourth Defense is legally insuffi-

cient and will grant Plaintiff SBA's motion for summary judgment. The Court also grants Key Bank's motion for summary judgment on Claim III.

## PROPERTY DAMAGE

H & S Realty's Claim IV seeks $30,-000 in damages from Key Bank due to a pipe freeze-up that H & S Realty alleges was due to Key Bank's negligence. H & S Realty asserts that in July of 1983, Key Bank succeeded to the tenancy of Hamilton & Son in the building leased from H & S Realty and that during the last week of December 1983, Key Bank's negligence resulted in an oil burner shutdown, leading the pipes to freeze, burst, and cause extensive damage. H & S Realty asserts that Key Bank negligently breached duties owed under the terms of the tenancy and duties imposed upon tenants at common law. Key Bank moves for summary judgment on four grounds; the Court finds them all insufficient and will therefore deny the motion.

First, Key Bank asserts that a defect in the condition of the heating system, rather than any act by Key Bank, caused the damage. This is clearly an issue of fact which cannot be resolved on a motion for summary judgment.

Second, Key Bank asserts that under a lease agreement executed in favor of Key Bank by Hamilton & Son, later agreed to by H & S Realty, Key Bank had no duty to maintain the premises. The clause in question states that "[Key Bank] shall not be responsible for the control, care or management of the premises, nor for carrying out any of the terms and conditions of said lease except at its option nor for any dangerous or defective condition of the premises." H & S Realty argues that "a fair reading" of this clause is that it applied only while Hamilton & Son retained possession of the premises; "[o]nce Key Bank obtained exclusive possession, however, it had a duty to maintain the premises just like any other tenant." Key Bank has not responded to this argument, and the Court is unwilling to conclude on this summary

judgment motion that the quoted clause unambiguously absolves Key Bank of any duty to maintain the premises even upon taking possession thereof. The Court also believes that an issue of fact is raised by H & S Realty's argument that even if Key Bank had no such duty as an initial matter, its undertaking to change the locks, clean the premises, ensure that the furnaces were working, and check on and fill the oil tank, imposed at least some duty on Key Bank to maintain the building in a nonnegligent manner. *See Restatement (Second) of Torts* § 323 (1965).

Third, Key Bank asserts that H & S Realty has waived its right to recover from Key Bank by accepting insurance proceeds in partial compensation for the damage to the building. H & S Realty does not dispute that it received such payments, but argues that the collateral source rule makes such payments irrelevant to Key Bank's liability. Key Bank's response is that the collateral source rule is inapplicable between two parties where one party is contractually obligated (as the mortgage obligated H & S Realty here) to insure for the benefit of the other; therefore, Key Bank asserts, the insurance proceeds constitute a satisfaction of any claim for the loss by one party against the other.

But Key Bank cites as support only two cases, both from Missouri, neither of which is persuasive. *Monsanto Chemical Co. v. American Bitumuls Co.*, 249 S.W.2d 428, 431 (Mo.1952), did hold that where a property owner was obligated by a contract with a bailee to insure the property against loss while in the bailee's possession, the owner's collection from the insurer of full compensation for a loss bars the owner from proceeding against the bailee for the loss. But the basis of the rule was the owner's presumed intent to look to the insurer, rather than the bailee, to cover losses resulting from the bailee's negligence; the clause obligating the owner to insure was inserted in the bailment contract to give effect to this intent.

The clause obligating H & S Realty to insure for the benefit of Key Bank, in

contrast, was inserted in the *mortgage* securing H & S Realty's loan guaranty to protect Key Bank in its capacity as secured party against loss of the mortgaged premises, rather than to protect Key Bank from liability for its own negligence in its capacity as lessee of the premises. Yet it is in Key Bank's capacity as lessee (pursuant to the lease assignment to Key Bank executed by lessee Hamilton & Son) that it was in possession of the premises when the loss occurred, and Key Bank does not argue that the *lease* obligated the lessor to insure against the lessee's negligence. Thus *Monsanto Chemical* has no application here. The other case cited by Key Bank, *Rock Springs Realty, Inc. v. Waid,* 392 S.W.2d 270, 277 (Mo.1965), merely relies on *Monsanto Chemical* and is therefore similarly inapplicable.

Fourth and finally, Key Bank asserts that it is entitled to summary judgment because H & S Realty accepted a check from its insurer marked "full settlement of all claims less deductible," procured Key Bank's endorsement (required because Key Bank was one of the parties to whom the check was jointly payable), and cashed the check. Key Bank claims that by procuring its endorsement on the check containing the "full settlement" language, "H & S Realty accepted payment for the damage as full settlement of all claims *against all named parties,*" including payee Key Bank. But this Court is unwilling to agree on this summary judgment motion that the "full settlement" language should, as a matter of law, be given such a strained construction. Nor does the Court on this record agree that H & S Realty, by accepting the check, has settled Key Bank's potential claim against the insurer and that it is consequently unfair for H & S Realty to proceed against Key Bank. Assuming, without deciding, that Key Bank had such a claim against the insurer, Key Bank itself endorsed the check and thus cannot pin full blame for accepting the settlement on H & S Realty. Key Bank's motion for summary judgment on Claim IV will, therefore, be denied.

ORDER

For the foregoing reasons, it is hereby *ORDERED:*

(1) that Plaintiff's and Third-party Defendant's motions to strike are *DENIED;*

(2) that Plaintiff's motion for summary judgment is *GRANTED;*

(3) that Third-party Defendant's motion for summary judgment on Claims I, II and III is *GRANTED;* and

(4) that Third-party Defendant's motion for summary judgment on Claim IV is *DENIED.*