**COMMERCIAL CREDIT CORPORATION, a Maryland Corporation, Plaintiff,**

v.

**Gilbert L. LANE, Elizabeth Lane, and B. D. Taylor, Defendants.**

**No. 77–38–Civ–Oc.**

United States District Court, M. D. Florida, Ocala Division.

March 8, 1979.

---

**16.** *See supra* note 13.

E. G. Musleh, Ocala, Fla., Robert F. Jordan, Fort Lauderdale, Fla., for plaintiff.

Gene H. Auvil, Brooksville, Fla., for defendants.

## OPINION

CHARLES R. SCOTT, Senior District Judge.

This cause is before the Court on cross motions for summary judgment. The record indicates that there are no genuine issues of material fact and, thus, the case is ripe for summary adjudication.

### Facts

Defendants, Gilbert L. Lane, Elizabeth Lane and B. D. Taylor, were the principal stockholders of a Florida corporation, Lane Mobile Homes, Inc., ('Lane, Inc.'), now defunct, which was in the business of retailing mobile homes in the State of Florida. Plaintiff, Commercial Credit Corporation ('CCC'), a Maryland corporation, provided inventory financing for Lane, Inc.

The financing arrangement involved several agreements between Lane, Inc. and CCC and the individual defendants. The first of these agreements would arise between Lane, Inc. and CCC when Lane, Inc. sold a mobile home to a retail customer. Ordinarily, the sale of a mobile home would be under an installment plan similar to a traditional home mortgage whereby Lane, Inc. would retain a security interest in the mobile home. This chattel paper produced by a sale would be sold to CCC and CCC would make collection on the retail customer's obligation.

The second agreement constituting the financing scheme is another agreement entered between Lane, Inc. and CCC. Accompanying the sale of the chattel paper to CCC, Lane, Inc. executed "recourse" agreements providing that should the retail customer default under the installment contract, Lane, Inc. would repurchase the chattel paper or reimburse CCC for any losses occasioned by the customer's default. These recourse agreements were of two types: one entitled 'Dealer Agreement' pro-

vided blanket coverage of most sales; the other called 'Individual Repurchase Agreement' was executed when the sale was not covered by the 'Dealer Agreement'. The provisions of the two agreements were exactly the same insofar as the "recourse" duties were concerned.

The third agreement, or set of agreements, creating the system of financing, was entered between CCC and each individual defendant. In the 'Guaranty' contracts, which provide the basis for plaintiff's claims, each defendant agreed to guarantee the performance of Lane, Inc. under the recourse agreements.

Three sales made under this financing plan are involved in the present suit. At all times material to this action, all agreements comprising the financing plan were duly executed and in force. The first of these sales was made to one, Willie Mae Nichols, on March 25, 1972. On May 8, 1975, Nichols became in default on the retail installment contract. By telephone and confirmation letter of June 27, 1975, CCC informed B. D. Taylor, as president of Lane, Inc. of the default. The letter read as follows:

June 27, 1975

Re: Willie Mae Nichols
  385 3277402

As per our telephone conversation, please make arrangements to pick up the above mobile home immediately. Please advise our office when you do so.

Having received no response to the letter, CCC, on August 11, 1975, repossessed the Nichols' mobile home. In September, 1975, CCC attempted to inform the individual defendants that the mobile home would be resold at private sale. The letter to B. D. Taylor, sent by certified mail, was received by him on September 30, 1975. The Notice of Private Sale letter sent to Mr. and Mrs. Gilbert Lane was refused by them. Finally, on October 12, 1975, the Nichols mobile home was sold at private sale, resulting in a deficiency of $1,350.65 in the retail sales contract.

The second sale was made to one, Angeline Coley, on October 6, 1972. On Septem-

ber 1, 1975, Coley became in default on the installment contract. By certified mail, the following letter was sent to Lane, Inc. on November 25, 1975:

(undated)

Ref: G. D. Coley
 72 Brigadier 64 × 12
 Serial 6357

Please be advised that the above mobile home has resulted in a repossession. We are in the process of picking up the unit per our agreement.

The Coley mobile home was then repossessed by CCC on May 11, 1976. A private sale made on September 23, 1977 (after this lawsuit was commenced) resulted in a deficiency of $4,867.77. No notice of the private sale was sent to any of the defendants.

The final sale involved in this suit is the subject of plaintiff's supplemental count to the complaint. On April 18, 1972, a mobile home was sold by Lane, Inc. to Tracy Deland. On December 11, 1977, Deland became in default on the contract. In an attempt to notify Lane, Inc. of the default, a letter was sent to it by registered mail on February 2, 1978. Acceptance of this letter was refused. Thereupon, on March 9, 1978, the following notice was served by the sheriff on Lane, Inc.

Lane Mobile Homes, Inc.
c/o Strout Realty, Inc.
U.S. Hwy 19 South
Crystal River, Fla. 32629
 Re: Tracy Deland Repossession
 1971 Chickasha Mobile Home
 Serial No: 7754–V
 60 × 12

Dear Sir:

The above Mobile Home has resulted in a repossession. Inasmuch as Bill Taylor has refused to pick up the unit as per a telephone conversation with him on February 23, 1978, we had a dealer in the area pick it up and it is now stored at Mobiland By The Sea in Melbourne, Florida.

The net pay-off is $4119.95. This includes $124.90 pick up fee and $150.00 for two axles and four wheels which had to be installed before unit could be moved.

We would appreciate your check by return mail.

Thank you.

Thereafter Notice of Private Sale was served on each of the defendants by sheriff's service. On May 16, 1978, a private sale was made of the Deland mobile home and a deficiency of $2,028.75 resulted.

On July 11, 1977, plaintiffs filed this suit against Gilbert Lane, Elizabeth Lane, B. D. Taylor and Shirley Taylor, based on their individual 'Guaranty' agreements. Since personal service could not be made upon Shirley Taylor, this Court lacks jurisdiction over her. Plaintiff seek damages in the amount of the deficiencies and reasonable attorneys' fees against the remaining three defendants.

■ Defendants filed a motion to dismiss plaintiff's complaint on January 30, 1978. This was followed by a motion for summary judgment filed by the plaintiff on February 10, 1978. Because defendants' motion relied on material outside the pleadings, on November 9, 1978, based on Fed.R.Civ.P. 12(c), this Court entered an order stating that defendants' motion to dismiss would be treated as a motion for summary judgment.

*LAW*

■ Defendants first challenge the plaintiff's complaint on the basis that this Court lacks subject matter jurisdiction. Defendants ground this view on the contention that plaintiff has failed to meet the requisite amount in controversy under 28 U.S.C. § 1331. The accepted rule is that the amount in controversy for federal diversity jurisdiction purposes is determined *as of the time the action is commenced*, and subsequent actions cannot divest the court of jurisdiction once it has been acquired. *Worthams v. Atlanta Life Ins. Co.*, 533 F.2d 994 (6th Cir. 1976); *King v. Morton*, 172 U.S.App.D.C. 126, 520 F.2d 1140 (1975); *Minsky's Follies of Florida, Inc. v. Sennes*, 206 F.2d 1 (5th Cir. 1953); *E. R. Wagner Manufacturing Co. v. Quadratec, Inc.*, 332 F.Supp. 810 (E.D.Wisc.1971). When this action was filed in July of 1977, there was

approximately $14,000.00 still owing on the contracts upon which plaintiff's suit was based. Several months after commencement of the suit, plaintiff recovered one-half of this balance by sales of the repossessed mobile homes. Since, at the time the suit was filed, plaintiff, in good faith, alleged damages in excess of the $10,000.00 jurisdictional amount, these subsequent acts cannot divest this Court of subject matter jurisdiction.

Defendants next contend that they cannot be liable under the 'Guaranty' agreements for two reasons: (1) because Lane, Inc. never defaulted on its obligation to CCC, which is a condition precedent to the triggering of the defendants' liability; and (2) even if Lane, Inc. did default, defendants were not given notice of resale of the mobile homes as required by statute. Since these contentions go to the merits of plaintiff's claim, Fed.R.Civ.P. 56(c), regarding summary judgment, governs. The standard to be applied is, whether on the evidence in the record, there is "no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Ecology Center of Louisiana, Inc. v. Coleman*, 515 F.2d 860 (5th Cir. 1975); *Greenberg v. General Mills Fun Group, Inc.*, 478 F.2d 254 (5th Cir. 1973).

The threshold issue is whether Lane, Inc., the primary obligor, defaulted on its obligations to CCC under the recourse agreements. The recourse provisions of the Dealer Agreement and the Individual Repurchase Agreement state that:

Seller [Lane, Inc.], with respect to any Instrument sold to you [CCC], no matter how assigned or endorsed to you, except as to those Instruments specifically guaranteed to you, agrees that he will, on demand, repurchase any mobile home repossessed by you, in whatever condition and wherever located, and will pay to you, in cash, the amount owing on the Instrument relating thereto and all expenses, less refund of unearned charges; provided however, that unless you are prevented by law or legal proceedings from completing repossession within such time, you shall make demand for repurchase within ninety days after maturity of the earliest unpaid installment of the Instrument still wholly in default. Title to any such repossessed mobile home shall not pass to Seller until you have received all amounts herein provided. If Seller takes possession of such mobile home before such payment, such mobile home shall be at Seller's risk and expense and will be redelivered to you upon demand. If Seller fails to repurchase a mobile home as herein provided, you may sell the same at public or private sale, and, at your election, charge any deficiency arising therefrom against the Dealer Reserve, or require Seller to pay the same to you, upon demand.

Defendants contend that demand was not made upon Lane, Inc. They argue that although Lane, Inc. was notified of the purchaser's default and that CCC "probably" had the right to demand repurchase, no such demand was actually made. This view is entirely too restrictive. Letters were sent to Lane, Inc. informing it of the default of the retail purchasers and that the provisions of the recourse agreements would be enforced. In response to the question of what he thought CCC meant by the letters sent to Lane, Inc. informing it of the defaults, B. D. Taylor, president of Lane, Inc., said he understood the letters to mean that Lane, Inc. was to repossess the mobile home. Additionally, Mr. Taylor admitted that this was the ordinary practice when a buyer defaulted. However, Lane, Inc. did not repossess any of the three mobile homes; CCC did.

In a commercial setting where transactions of the nature now before the Court are regularly and routinely executed, the Court cannot accept a view which would look past the obvious knowledge and understanding of the parties. It seems clear from the record as a whole, that Lane, Inc. knew that upon the default of a retail purchaser under the installment contract sold to CCC, Lane, Inc. was to repurchase the mobile home, and, therefore, proper demand was made.

In the alternative, it should be noted that the contracts for recourse provided for Lane, Inc. to pay to CCC all monies owing on the balance of any installment contract in default. Although defendants contend that demand to repurchase the three mobile homes was never made, they fail to refute the fact that Lane, Inc. has never paid the amounts in default to CCC. This alone places Lane, Inc. in default of its obligation under the Dealer Agreement and Individual Repurchase Agreement.

Thus, having found that Lane, Inc. defaulted on its obligations to CCC, the liability of the individual defendants comes into question. These 'Guaranty' agreements provide in pertinent parts:

> For valuable consideration, the receipt of which is acknowledged, Undersigned [individual defendants] jointly and severally unconditionally guarantee to you [CCC] the full and prompt performance by Lane Mobile Homes, Inc. [Lane, Inc.], a Florida corporation, 2629 E. 15th St. Panama City, Fla. 32401, herein called "Obligor", of all obligations which Obligor presently or hereafter may have to you and payment when due of all sums presently or hereafter owing by Obligor to you, and agree to indemnify you against any losses you may sustain and expenses you may incur as a result of any wrongful act of Obligor.
>
> \*    \*    \*    \*    \*    \*
>
> For the purposes of this guaranty and indemnity, all sums owing to you by Obligor shall be deemed to have become immediately due and payable if (a) Obligor defaults in any of its obligations to you;
>
> \*    \*    \*    \*    \*    \*
>
> Notice of your acceptance hereon, of default and nonpayment by Obligor or any other parties, of presentment, protest and demand, and of all other matters of which Undersigned otherwise might be entitled, is waived.

Facially, the agreement imposes liability upon defendants at the point when Lane, Inc. failed to perform. Although defendants raise the issue of the lack of prior notice of the resale by CCC of the mobile homes as a defense to any deficiency resulting from the resale, the undisputed facts show that defendants were given notice of the sale of the Nichols mobile home and the sale of the Deland mobile home. Consequently, the lack of notice defense is unavailable in these two instances, and defendants are liable for the deficiencies on the resales.

With respect to the Coley mobile home, however, defendants' contentions merit further discussion. Defendants' notice argument is grounded on provisions of the Uniform Commercial Code, enacted in Florida at Fla.Stat. § 679.9–501(3)(b), which prevent waiver or variation of rights provided a debtor by other sections of the Code. One such right is found in Fla.Stat. § 679.9–504(3) which states in part that

> Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification.

Since the protection afforded by this section extends only to debtors, Fla.Stat. § 679.9–501(3), the question becomes whether defendants are debtors within the meaning of the Code.

> Fla.Stat. § 679.9–105(1)(d) defines a debtor to be
>
> . . . the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper.

The issue crucial to this case is whether defendants "owed payment or other performance of the obligation secured". Plaintiff contends that defendants did not owe performance of a secured obligation, but, rather, owed performance on a collateral personal contract of guaranty which is

outside the bounds of the Uniform Commercial Code. Defendants contend to the contrary. They assert that the Uniform Commercial Code controls because the "obligation secured" was the retail installment sales contract and that the "performance owed" was the duty to indemnify CCC for any losses resulting from a default of the retail sales contract for which Lane, Inc. failed to cover.

Several Florida cases provide support for defendants' position and reject the view espoused by plaintiff. In *Hepworth v. Orlando Bank & Trust Co.*, 323 So.2d 41 (4th D.C.A.Fla.1975), the court held that a guarantor for the payment of a promissory note secured by collateral is a debtor under the Uniform Commercial Code so as to be entitled, upon default of the note, to notice prior to sale or disposition of the collateral. The holding of *Barnett v. Barnett Bank of Jacksonville*, 345 So.2d 804 (1st D.C.A.Fla. 1977) made clear that a debtor of the type in *Hepworth* could not waive the notice requirement of Fla.Stat. § 679.9–504(3).

The express rationale of these decisions was that the guarantor "stands in the shoes of the debtor not only with respect to liability for payment but also in regard to entitlement to notice prior to sale of the collateral". The courts reasoned that requiring notice to be given to a guarantor serves the same purpose and provides the same protection as that afforded the debtor. For instance, the guarantor, upon learning of the default and impending sale, could purchase the collateral himself; could pay the extent of the outstanding liability on the indebtedness; or could secure purchasers for the collateral. *Turk v. St. Petersburg Bank & Trust Co.*, 281 So.2d 534, 536 (2d D.C.A.Fla.1973).

In the present case, although defendants' obligations were one step further removed from the original debtor that the defendants in *Hepworth* and *Barnett*, i. e. here, guarantors of the guarantor, there is no reason that the same analysis should not be employed. Any liability imposed upon defendants would ultimately be due to the failure of the retail purchaser to pay the total installment price. Although proper performance by Lane, Inc. would have protected defendants, in the absence of performance by Lane, Inc., the extent of their liability would be measured by the balance remaining on the retail sales contract. Had defendants been given notice of the sale of the collateral, they could have opted for one of the alternatives mentioned above to ensure against liability. At the very least, notice of an impending sale would have provided defendants the opportunity to assure that the price obtained for the mobile home was the best price possible. *Rushton v. Shea*, 423 F.Supp. 468, 470 (D.Del.1976). Since defendants' personal resources were subject to being called upon to meet any deficiency resulting from the resale of the mobile home, no basis exists for denying them the protections afforded by the notice requirement. Hence, the Court holds that defendants were debtors within the meaning of Fla.Stat. § 679.9–504(3) and, therefore, entitled to prior notice of the sale of the Coley mobile home. Moreover, defendants' attempted waiver of the right to notice was ineffective. Fla.Stat. 679.9–501(3)(b), *Barnett v. Barnett Bank of Jacksonville*, 345 So.2d at 806.

Having found that defendants were debtors entitled to notice, it remains to be determined what effect the failure of CCC to give the notice has on defendants' liability. Although there is a split of authority among the jurisdictions that have enacted the Uniform Commercial Code, Florida follows the majority rule which precludes recovery of any deficiency where the requisite notice prior to sale or disposition is not given. *Barnett v. Barnett Bank of Jacksonville*, 345 So.2d at 806; *Hepworth v. Orlando Bank & Trust Co.*, 323 So.2d at 42; *Turk v. St. Petersburg Bank & Trust Co.*, 281 So.2d at 536; *Washington v. First National Bank of Miami*, 332 So.2d 644, 645 (3d D.C.A.Fla.1976); *see also Norton v. National Bank of Commerce of Pine Bluff*, 240 Ark. 143, 398 S.W.2d 538, 542 (1966). In conformity with this rule, the Court holds that CCC, in failing to give notice prior to the resale of the Coley mobile home, forfeit-

ed its right to recover from defendants any deficiency resulting from that sale.

Defendants also raise as a defense the question of the commercial reasonableness with which the resales were conducted. Although such a claim should rarely be disposed of on a motion for summary judgment, *Applestein v. National Bank of Tulsa*, 358 So.2d 106, 108 (3rd D.C.A.Fla.1978), it is proper when the record is clear that no facts support the allegation. Since the resales were made from retail mobile home sales lots, within reasonable times after repossession and, by defendants' own admission, for prices equal to or greater than defendants would have expected, the Court must find that the resales were conducted in a commercially reasonable manner.

Finally, defendants assert, by way of counterclaim, the right to recover penalty damages under Fla.Stat. § 679.9–507(1) for plaintiff's failure to give the required notice prior to sale of the Coley mobile home. Defendants base this claim on the contention that the mobile home was "consumer goods". Despite the categorization of the mobile home in the hands of the retail purchaser, contrary to defendants' position, the mobile home was not "consumer goods" in relation to defendants because, once repossessed, it regained its character as inventory. *Anderson, Uniform Commercial Code*, § 9–109.9 (2d Ed.1971).

Accordingly, judgment will be entered against defendants in the amount of $3,379.40, which represents the deficiencies resulting from the resale of the mobile homes originally purchased by Nichols and Deland. Plaintiff shall recover nothing on the resale of the Coley mobile home.