**CHRYSLER CREDIT CORPORATION, Plaintiff,**

v.

**Edward R. CURLEY, Jr., Barbara A. Curley, et al., Defendants.**

Civ. A. No. 90–484–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 20, 1990.

Carol T. Stone, Jordan Coyne Savits & Lopata, Fairfax, Va., for plaintiff.

William B. Cave, Felton & Cave, Richmond, Va., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This is a diversity action on a guaranty. Plaintiff Chrysler Credit Corporation ("Chrysler") seeks recovery from a group of five guarantors of an automobile dealership. Default judgments have been entered against three of the five.[1] The remaining two guarantors are defendants Edward and Barbara Curley. Before the Court are plaintiff's motion for summary judgment against the Curleys on the entire indebtedness of the dealership and the Curleys' motion for partial summary judgment as to one aspect of the dealership's liability. Central to the disposition of these motions is the validity and effect of a guarantor's pre-default, unconditional guaranty of payment which includes a waiver of certain rights provided to debtors under Virginia's version of the Uniform Commercial Code ("UCC"). More specifically, the questions presented are 1) whether Virginia law permits a guarantor, prior to default, to waive the rights to notice and to a commercially reasonable disposition of collateral provided by UCC § 9–504(3), and 2) whether another contract between Chrysler and the debtor, the Vehicle Financing and Repurchase Agreement, precludes Chrysler's reliance on an unconditional guaranty of payment. For the reasons stated below, the Court concludes (i) that defendants' pre-default waiver of the right to notice and to object to the commercial reasonableness of the collateral sale is valid, (ii) that Chrysler's remedy under the guaranty is not precluded by the Vehicle Financing and

---

1. By Order dated July 3, 1990, this Court entered judgment by default against co-guarantor John Harry Hadjy in the amount of $376,701.24. By Order dated July 6, 1990, the Court also granted Chrysler default against two other co-guarantors, William P. Stevenson and Thalia Stevenson. By Order dated December 20, 1990, the Court also entered final judgment by default against the Stevensons.

Repurchase Agreement, and (iii) that defendants are liable to Chrysler for the full amount still owed Chrysler after the sale of the collateral.

## I. *Background*

In early 1987, defendants and others incorporated Dahlgren Chrysler–Plymouth, Dodge, Inc., (the "Dealership"), a Virginia corporation, for the purpose of selling motor vehicles in Dahlgren, Virginia. Subsequently, they obtained a dealer franchise from Chrysler Motors Corporation. As part of the franchise relationship, the Dealership entered into a number of contracts with Chrysler, including a Security Agreement, Master Credit Agreement, and various financing agreements. In conjunction with these agreements, defendants also executed a Continuing Guaranty (the "Guaranty").[2]

By mid–1989, the Dealership was in financial difficulty. On May 31, 1989, the Dealership forwarded to Chrysler three checks representing amounts owed on three automobiles Chrysler had financed for the Dealership. On June 9, 1989, the Dealership's bank refused to honor the checks and returned them to Chrysler marked "N.S.F." (no sufficient funds). Thereafter, Chrysler conducted inventory audits at the Dealership, declared that the Dealership's indebtedness was due, and on June 22, 1989, seized the assets of the Dealership as collateral pursuant to an order of the Circuit Court of King George County, Virginia. Chrysler then proceeded to dispose of the repossessed collateral by means of direct sales and consignments. The Dealership closed sometime in June or July of 1989. On February 12, 1990, Chrysler made demand on the defendants, as guarantors, to satisfy the deficiency remaining from the asset sales. When defendants failed to respond to the demand, Chrysler filed this suit.

Plaintiff's motion is based on the Guaranty executed by defendants on March 16, 1987. Pursuant to the Guaranty, defendants agreed, as primary obligors, jointly and severally, to guarantee unconditionally to Chrysler the full and prompt payment when due of all indebtedness of the Dealership. Defendants further agreed that Chrysler could have immediate recourse against the guarantors without any obligation to seek relief first against the Dealership. In short, Chrysler need not foreclose or realize on any collateral security before demanding payment from defendants. Finally, by the Guaranty's terms, defendants agreed to waive in general "each and every defense which, under principles of guarantee or suretyship law, would otherwise operate to impair or diminish the liability of Guarantor for the Indebtedness." Guaranty ¶ 4. Especially pertinent to the instant motions, the Guaranty also contains two specific waivers regarding notice: 1) "[t]he making of a demand, or absence of demand, for payment of the Indebtedness, or giving, or failing to give, any notice of dishonor or protest or any other notice"; 2) "[a]ny notice of the disposition of any collateral security and any right to object to the commercial reasonableness of the disposition of any such collateral security." Guaranty ¶¶ 4(f), 5(d).

## II. *Analysis*

Chrysler asserts three claims. First, Chrysler seeks recovery for eight automobiles financed by Chrysler and sold by the Dealership, but for which Chrysler never received payment. Automobiles sold in this fashion typically are referred to in the industry as "sold out of trust." The parties have stipulated that as of the date of repossession, the Dealership owed Chrysler the principal amount of $82,374.84 for these vehicles.

Chrysler's second claim is for losses from the repossession and sale of the Dealership's assets. The parties have stipulated that Chrysler's total losses, after ap-

---

**2.** In reliance on defendants' execution of the Guaranty and other contracts, Chrysler made loans to the Dealership which were evidenced by promissory notes in the amount of $600,000 (March 16, 1987) and $1,000,000 (May 27, 1987). The loans were also secured by a perfected security interest in all of the Dealership's vehicles financed by Chrysler, its proceeds, accounts, inventory, and equipment. *See* Magistrate's Report and Recommendation filed July 31, 1990, at 1.

plication of all recoveries, aggregate $105,-722.08.

Third, Chrysler seeks recovery for losses incurred on the repossession and sale of vehicles financed for consumer purchasers. These losses were sustained when, after the Dealership ceased doing business, certain customers whose purchase contracts had been financed by Chrysler defaulted on their obligations to pay. Chrysler seeks $124,059.17 on this claim.

Defendants concede, in both written and oral argument, that they are liable as guarantors for the outstanding obligation of the Dealership with respect to Chrysler's first claim regarding vehicles sold out of trust. Similarly, defendants "raise no defense" as to the Dealership's or their personal liability as guarantors for deficiencies resulting from most of Chrysler's sales of the collateral. Defendants' Memorandum in Opposition to Summary Judgment and in Support of Motion for Partial Summary Judgment at 4–5.[3] As to Chrysler's second claim, defendants' sole objection, on grounds of notice and commercial reasonableness, is to Chrysler's disposition of the Dealership's new and used inventory through the Fredericksburg Auto Auction. Consequently, the issues remaining to be resolved are the disposition of the inventory and Chrysler's third claim regarding vehicles financed for consumer purchase.

**A. Disposition of Inventory**

Chrysler consigned the majority of the Dealership's vehicle inventory to Chrysler Motor Corporation for sale at Chrysler Motor's bi-weekly fleet auction conducted by Fredericksburg Auto Auction. Defendants assert two UCC-based objections to this disposition: first, that the notice provided to them by Chrysler was inadequate, and second, that the auction sale was not commercially reasonable. *See* Va.Code § 8.9–504(3).[4]

In the ordinary debtor-creditor situation, defendants' objections might well be valid. Here, however, the Guaranty by its express terms specifies that defendants waived their right to notice and the right to object to alleged commercial unreasonableness with regard to the disposition of Chrysler's collateral security. The pertinent question is thus whether a guarantor, prior to default, may waive the rights which UCC § 9–504(3) expressly confers on debtors.

The Supreme Court of Virginia has not ruled on the issue of pre-default waiver by a guarantor.[5] Other jurisdictions are divided on the issue. The majority of federal courts, as well as some state courts, permit guarantors to waive UCC § 9–504(3) rights prior to default.[6] A substantial

---

**3.** More specifically, defendants do not appear to object to Chrysler's sales of vehicles to Tidewater Dodge, Heritage Chrysler–Plymouth, and Thalia Stevenson or to the notice of those sales provided by Chrysler. Nor do defendants dispute the commercial reasonableness of the auction of the Dealership's fixed assets. Defendants' Memorandum in Opposition to Summary Judgment and In Support of Motion for Partial Summary Judgment at 4–5.

**4.** Va.Code § 8.9–504(3) provides in relevant part: "Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or

other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale."

**5.** Neither party sought certification to the Supreme Court of Virginia. *See* Rule 5:42, Rules of the Supreme Court of Virginia.

**6.** *See, e.g., National Bank of Washington v. Pearson,* 863 F.2d 322 (4th Cir.1988) (deferring to state and district courts' interpretation of Maryland UCC); *United States v. H & S Realty Co.,* 837 F.2d 1 (1st Cir.1987) (Maine UCC); *United States v. New Mexico Landscaping, Inc.,* 785 F.2d 843 (10th Cir.1986) (relying on *American Bank of Commerce v. Covolo,* 540 P.2d 1294 (N.Mex. 1975)); *United States v. Meadors,* 753 F.2d 590 (7th Cir.1985) (relying on, *inter alia, Carney v. Central Nat. Bank of Greencastle,* 450 N.E.2d 1034 (Ind.App.1983)); *United States v. Lattauzio,* 748 F.2d 559 (10th Cir.1984); *United States v. Kukowski,* 735 F.2d 1057 (8th Cir.1984) (applying UCC as rule of federal law); *First Nat. Park Bank v. Johnson,* 553 F.2d 599 (9th Cir.1977)

number of jurisdictions have reached the opposite result, reasoning that pre-default waivers by guarantors conflict with the UCC's express prohibition against waiver of certain rights by debtors, including the rights specified in UCC § 9–504(3).[7] *See* UCC § 9–501. Because this is a diversity matter and because the issue is unsettled in Virginia, this Court has the challenging task of divining which line of authority the Supreme Court of Virginia would choose to follow were it squarely presented with this question. *See Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *see also Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967); *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 209, 76 S.Ct. 273, 279, 100 L.Ed. 199 (1956) (Frankfurter, J., concurring). On balance, the factors pertinent to this choice point persuasively to the conclusion that Virginia would permit pre-default waivers by guarantors.

Analysis properly begins with Va.Code § 8.9–501(3), Virginia's anti-waiver rule.[8] This section generally prohibits, except where explicitly authorized, debtor waivers of the right to notice of the collateral sale and the right to a commercially reasonable disposition. Taken together with § 8.9–504(3), which permits debtors to waive the right to notice after default by means of a written statement, § 8.9–501(3) invites the inference that debtors may not waive their § 8.9–504(3) rights in the pre-default context. *See Commercial Discount Corp. v. King,* 515 F.Supp. 988, 990 (N.D.Ill.1981). Indeed, the rule barring pre-default waivers by debtors is well-established. *See* 9 Anderson, Uniform Commercial Code § 9–504:64 (3d ed. 1985 & Supp.1990); 69 Am.Jur.2d, Secured Transactions §§ 617, 624 (citing cases). But the analysis does not end here, for the anti-waiver rule in § 8.9–501(3) refers solely to the "debtor"; guarantors are not explicitly mentioned. Some courts have found this significant.[9] On the other hand, the general Code definition of "debtor" for the Code provisions on secured transactions is broad enough to encompass guarantors "where the context so requires."[10] The question,

(Kennedy, J.) (Montana UCC); *United States v. Dehaven,* 703 F.Supp. 414 (D.Md.1989); *United States v. Lowy,* 703 F.Supp. 1040 (E.D.N.Y.1989); *United States v. Frey,* 708 F.Supp. 310 (D.Kan. 1988); *United States v. Kurtz,* 525 F.Supp. 734 (E.D.Pa.1981), *stay denied,* 528 F.Supp. 1113 (E.D.Pa.1981), *aff'd,* 688 F.2d 827 (3d Cir.1982), *cert. denied,* 459 U.S. 991, 103 S.Ct. 347, 74 L.Ed.2d 387 (1982); *First City Div. of Chase Lincoln First Bank, N.A. v. Vitale,* 123 A.D.2d 207, 510 N.Y.S.2d 766 (App.1987); *Mutual Finance Co. v. Politzer,* 21 Ohio St.2d 177, 256 N.E.2d 606 (Ohio 1970).

**7.** *See, e.g., United States v. Hunter,* 652 F.Supp. 774 (D.Kan.1986); *United States v. Lang,* 621 F.Supp. 1182 (D.Vt.1985); *Ford Motor Credit Co. v. Lototsky,* 549 F.Supp. 996 (E.D.Pa.1982); *Commercial Discount Corp. v. King,* 515 F.Supp. 988 (N.D.Ill.1981); *Prescott v. Thompson Tractor Co.,* 495 So.2d 513 (Ala.1986); *Barnett Bank of Tallahassee v. Campbell,* 402 So.2d 12 (Fla.App. 1981); *Nelson v. Monarch Invest. Plan, Inc.,* 452 S.W.2d 375 (Ky.1970); *Norton v. National Bank of Commerce,* 240 Ark. 143, 398 S.W.2d 538 (Ark.1966); *see also United States v. Willis,* 593 F.2d 247 (6th Cir.1979) (not relying on § 9–501, but permitting guarantors to invoke defense of commercial reasonableness as a non-waivable part of federal common law).

**8.** Va.Code § 8.9–501(3) provides in relevant part: "To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (3) of § 8.9–504 and § 8.9–505) and with respect to redemption of collateral (§ 8.9–506) but the parties may by agreement determine the standards by which fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable: (a) subsection (2) of § 8.9–502 and subsection (2) of § 8.9–504 insofar as they require accounting for surplus proceeds of collateral; (b) subsection (3) of § 8.9–504 and subsection (1) of § 8.9–505 which deal with disposition of collateral".

**9.** *See National Bank of Washington v. Pearson,* 863 F.2d 322, 326 (4th Cir.1988) (stating that while UCC § 9–501(3) prohibits waiver by debtors, "[t]he UCC is silent ... as to a guarantor's capacity to do so"); *First Nat. Park Bank v. Johnson,* 553 F.2d 599, 602 (9th Cir.1977) (Kennedy, J.) (guarantors are not debtors within meaning of UCC § 9–501(3)).

**10.** Va.Code § 8.9–105(1)(d) provides as follows: "Debtor" means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts or chattel paper. Where the debtor

then, is whether in this context, Virginia requires that guarantors be treated under the Code as debtors. Put another way, the question is whether Virginia, which prohibits pre-default waivers by debtors of certain rights against creditors, would also apply this prohibition to guarantors.

Central to the resolution of this question is *Rhoten v. United Virginia Bank*, 221 Va. 222, 269 S.E.2d 781 (1980). There, the Supreme Court of Virginia held that a co-maker on a loan for a mobile home was entitled to the same notice of collateral disposition as the principal debtor. The co-maker or guarantor was thus a "debtor" within the meaning of § 8.9–504(3). In reaching this conclusion, the court noted that the co-maker must be considered a "debtor" within the meaning of Va.Code § 8.9–105(1)(d). *See* 269 S.E.2d at 785. But significantly, the court did not indicate whether this statement equating debtors and guarantors applied to all UCC Article 9 secured transactions provisions in all contexts or only in the context of § 8.9–504(3), the provision there in issue. Still, *Rhoten* may be read as inviting the inference that Virginia guarantors are debtors for all purposes under the Code, including the anti-waiver rule in § 8.9–501(3). On closer analysis, however, this inference is not warranted; *Rhoten* is not dispositive of the precise question presented here. Not addressed in *Rhoten* was the issue of waiver. And significantly, the court's holding that guarantors or obligors have the same rights as debtors under § 8.9–504(3) is not inconsistent with the conclusion that guarantors may waive their rights. Apart from not mentioning waiver, the court emphasized that the post-default context justified treating the co-maker as a "debtor". *See* 269 S.E.2d at 784 (noting the "context so requires" language of § 8.9–105(1)(d)); *id.* at 785 ("We believe, therefore, that the context in which the term 'debtor' is employed in § 8.9–504(3) requires that the term be interpreted to include [the obligor]"). Thus, it does not follow from the

court's grant of § 8.9–504(3) rights to guarantors that the court would prohibit waivers by guarantors in the pre-default context. Simply put, *Rhoten* does not address the context of pre-default waivers by guarantors. Significantly, many courts have recognized the error in the syllogism which holds that because debtors have certain rights that may not be waived, guarantors provided with the same rights must also be prohibited from exercising any waiver. For example, in *National Bank of Washington v. Pearson*, 863 F.2d at 326, the Fourth Circuit noted that the majority of jurisdictions consider guarantors to be debtors for purposes of UCC Article 9 as a whole, a conclusion more sweeping than any statement in *Rhoten*. Even so, the Fourth Circuit deferred to the conclusion of a Maryland state court and the district court that a guarantor had waived his rights under UCC § 9–504(3) and that waiver was permitted by Maryland's version of the UCC, which, in material respect, is identical to Virginia's. The Fourth Circuit explicitly considered waiver as a question separate from the entitlement to rights under § 9–504(3). *See id.* at 326–27.

Similarly, several other courts have recognized that simply because guarantors may have the same affirmative rights as debtors does not dictate that guarantors may not waive their rights if they believe it is in their interest to do so. *See, e.g., United States v. New Mexico Landscaping, Inc.*, 785 F.2d 843, 845–47 (10th Cir. 1986) (§ 9–504 of New Mexico UCC "inures to the benefit of a guarantor", but guarantor may waive § 9–504(3) rights); *United States v. Meadors*, 753 F.2d 590, 594 (7th Cir.1985) (fact that Indiana UCC assures guarantors the same rights as debtors does not mean that guarantor may not waive those rights); *United States v. DeHaven*, 703 F.Supp. 414, 415 (D.Md.1989) (stating "[a]lthough both debtors and guarantors are entitled to the protection of § 9–504(3), guarantors may effectively waive that protection in the guaranty"); *United States v.*

---

and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the title dealing with the collateral, the obligor in

any provision dealing with the obligation, and may include both where the context so requires[.]

*H & S Realty Co.,* 647 F.Supp. 1415, 1420–23 (D.Me.1986) (predicting that Maine courts would extend § 9–504(3) protections to guarantors but holding nevertheless that guarantor could waive its rights), *aff'd,* 837 F.2d 1 (1st Cir.1987). Consistent with UCC § 9–105's acknowledgement of the relevance of context, these decisions recognize implicitly that the pre-default context may differ as between guarantors and debtors.[11]

The decisions permitting pre-default waiver by guarantors also recognize that where, as here, there is no statutory warrant for a different result, courts should take care not to create restrictions on the parties' freedom to contract. *See, e.g., National Acceptance Co. of America v. Wechsler,* 489 F.Supp. 642, 648 (N.D.Ill. 1980) (explaining that guaranty agreements which provide the lender with a ready source from which it can collect in the event of default by the debtor facilitate the issuance of loans); *United States v. Lowy,* 703 F.Supp. at 1044 n. 5 (citing by analogy to *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) for the proposition that absent legislative warrant, courts should be reluctant to alter workable commercial practices).

The facilitation of credit is not the only rationale given by courts in permitting pre-default waiver by guarantors. For example, some courts have explained that as a general matter a guarantor is thought to have a lesser interest in the collateral as compared to the debtor, see *National Acceptance Co. of America v. Wechsler,* 489 F.Supp. at 647–48, and that guarantors do not need the protection of § 9–501(3) be-

cause they are more likely than debtors to enter into contracts with their eyes open. *See First National Park Bank v. Johnson,* 553 F.2d at 602 (explaining that upholding a guarantor's waiver will not deprive the principal debtor of § 9–504(3) protections); *United States v. H & S Realty Co.,* 837 F.2d at 2 (noting that the UCC policy of debtor protection is not contravened by a guarantor's waiver because the case of a guarantor is "one step removed from the debtor and the U.C.C. policy"). Also persuasive is the reasoning that because UCC § 9–501 already establishes a check on the discretion of creditors through the debtor, a nonwaivability rule applied to guarantors provides little in the way of added protection. As explained by the district court in *United States v. H & S Realty,*

> The Court recognizes that the general purpose of section 9–504(3) protection is to prevent the economic waste that would result from commercially unreasonable dispositions of collateral and/or dispositions without notice to those legally interested in that collateral. Because the debtor will most frequently be legally interested in the collateral, section 9–501(3)(b) creates a prophylactic nonwaivability rule to protect all debtors from such dispositions. In other words, the UCC through the nonwaivability rule in effect appoints the debtor, as the party with the greatest incentive to ensure a commercially reasonable disposition of the collateral, to guard against economic waste. That function being fulfilled, there is no need for a nonwaivability rule applicable to guarantors as well.

647 F.Supp. at 1423.

In sum, in the absence of explicit statutory direction, guarantors should not be

---

11. In contrast, many of the cases holding that guarantors may not waive § 9–504(3) protection seem to leap uncritically from the *Rhoten*-type decision that guarantors have a right to notice or to a commercially reasonable collateral disposition under § 9–504(3) to the conclusion that these rights are not waivable. *See, e.g., United States v. Lang,* 621 F.Supp. 1182, 1184 (D.Vt. 1985), *criticized in United States v. H & S Realty Co.,* 647 F.Supp. at 1423; *Commercial Discount Corp. v. King,* 515 F.Supp. 988, 991 (N.D.Ill. 1981), *criticized in United States v. Crispen,* 622 F.Supp. 75, 78 & n. 3 (N.D.Ill.1985); *Commercial Credit Corp. v. Lane,* 466 F.Supp. 1326, 1332 (M.D.Fla.1979). The district court in *United States v. H & S Realty Co.* cogently explained that there is no inconsistency between granting a guarantor the same rights as a debtor and permitting the guarantor to waive rights, stating "[t]his is not to say that a guarantor may not insist on proper notice and a commercially reasonable disposition of the collateral; the Court has expressed above the view that a guarantor has these rights.... It is, rather, merely to say that the policies of the UCC do not require that a guarantor be prohibited from waiving these rights...." 647 F.Supp. at 1423.

prohibited from waiving the right to notice [12] or the right to object to the commercial reasonableness of the collateral disposition.[13] This conclusion is also consistent with the UCC's general policy that "[u]nless displaced by the particular provisions of this act, the principles of law and equity", including traditional doctrines of waiver and estoppel, "shall supplement its provisions." *See* Va.Code § 8.1–103; *see also* 1 Anderson, Uniform Commercial Code § 1–103:69 (3d ed. 1985) ("The Code does not displace the prior principles of law governing waiver."). Here, nothing in the record suggests that defendants did not knowingly and voluntarily agree to the waiver. *See United States v. H & S Realty*, 837 F.2d at 2 ("We confess to assigning some weight to the fact that [guarantor] did sign a lengthy and explicit waiver.").

Defendants' authorities are not to the contrary. As explained above, *Rhoten* does not compel the conclusion that a guarantor's rights may not be waived. *In Re Bishop*, 482 F.2d 381 (4th Cir.1973), is also inapposite. As is true of *Rhoten*, *Bishop* did not consider the effect of a guarantor's waiver of any right to object to the commercial reasonableness of the collateral disposition. But defendants also cite *Bishop* for the proposition that Virginia would bar recovery of a deficiency by a secured party who violates the provisions of Va.Code § 8.9–504(3). This reliance is misplaced. To begin with, the *Bishop* court scrupulously refrained from deciding this question. The court noted the absence of a "definitive ruling" by the Supreme Court of Virginia and simply concluded that on the facts presented the bankruptcy court did not err. "[T]he outcome of this appeal need not rest on speculation about the rule Virginia ultimately will apply to recovery of deficiencies." 482 F.2d at 385. Second, subsequent Virginia decisions have distinguished *Bishop* and rejected the concept of absolute bar. *See, e.g., In Re Parrish*, 110 B.R. 229, 230–31 (Bankr.W.D.Va.1989) (holding that facts of each case should determine whether deficiency is barred or recoverable and permitting recovery where

**12.** Even assuming a bar in Virginia to guarantor pre-default waivers, defendants' notice objection still fails. To begin with, the parties have stipulated that Chrysler mailed to defendants (i.e. "sent", in compliance with UCC § 9–504(3)) a "Notice of Disposition of Collateral After Default" which stated that on or after July 14, 1989, Chrysler would sell the repossessed assets of the Dealership at *private sale*. Similarly, the material facts concerning the nature of the Fredericksburg Auto Auction are not disputed. Participation in the Chrysler Motors Corporation fleet auction is limited to Chrysler authorized dealerships, and acceptable sales prices and floor prices incident to such sales are established by Chrysler Motors. On these facts, the auction was plainly a private sale. *Ford Motor Credit Co. v. Solway*, 825 F.2d 1213 (7th Cir. 1987) is dispositive on this issue. There, Ford took possession of the inventory of a retail automobile dealership that was in default under a secured financing agreement. Some of the inventory was sold to other dealers through the Arena Auto Auction, attendance at which was restricted to retail automobile dealers. The Seventh Circuit held that where the public is not permitted to attend the auction and advertising is directed only at Ford dealers, the auction is a private sale. *See* 825 F.2d at 1218 (citing Restatement of Security § 48, comment C (1941) defining "public sale" as "one to which the public is invited by advertisement to appear and bid at auction for the goods to be sold"); *see also John Deery Motors, Inc. v. Steinbronn*, 383 N.W.2d 553 (Iowa 1986) (secured party's sale of automobile at an automobile auction, at which there was competitive bidding but only by licensed automobile dealers, was a private sale under § 9–504(3)). Similar facts compel the same result here. "To term the auction a 'public' sale would certainly not conform with the usual meaning of the word 'public.'" *Solway*, 825 F.2d at 1218. Chrysler simply informed defendants that the inventory would be sold at private sales after a certain date. This conformed to the requirement of UCC § 9–504(3) that the secured party send notice of "the time after which any private sale ... is to be made."

**13.** Waiver is not the only obstacle to defendants' objection to the commercial reasonableness of the collateral disposition. Defendants' claim of a disparity in price and the "method of sale" contributing to that price appears to fit within Va.Code § 8.9–507(2), which provides that the fact that a better price could have been obtained by a sale using a "different method from that selected by the secured party" is not itself sufficient to establish a lack of commercial reasonableness. The same section also provides a conclusive presumption that collateral sales "in the usual manner in any recognized market" are commercially reasonable. The existence of this conclusive presumption reflects, contrary to defendants' suggestion, that the determination of commercial reasonableness need not always be a question of fact.

618

secured creditor's only failure was lack of notice to debtor prior to sale); *Smith v. Paige*, VLW 90–H–176 (1990); *First Virginia Bank v. Richardson*, 13 Va.Cir.198 (1988) (rule that would establish absolute bar to recovery of deficiency is inconsistent with Virginia UCC). Finally, to impose a commercial reasonableness requirement on secured parties in cases of pre-default waiver would nullify the waiver. If guarantors may waive the right to object, but commercial reasonableness is nonetheless held to be a prerequisite to recovery of a deficiency, then the waiver is effectively meaningless.

Although inapposite, *Bishop* does raise the concern that if a guarantor may waive § 9–504(3) rights, there may be nothing to prevent a creditor from disposing of collateral in a highly abusive manner. It is this fear of abuse by creditors—that if guarantors are not protected against even their own waivers, the secured party might be able to collect a deficiency no matter how egregiously that party might circumvent its duties—that appears to provide the chief rationale of decisions prohibiting pre-default guarantor waivers. *See, e.g., United States v. Willis*, 593 F.2d 247, 255 (6th Cir.1979); *Ford Motor Credit Co. v. Lototsky*, 549 F.Supp. 996, 1004 (E.D.Pa.1982). But the risk of abusive collateral dispositions is no reason to prohibit pre-default guarantor waivers. As the First Circuit noted in *United States v. H & S Realty Co.*, the fear of a "worst case" scenario incorrectly regards the UCC as an insurer of all parties and "claims too much sovereignty" for the Code. *See* 837 F.2d at 3.

[T]o assume that guarantors will waive the protection, against their interests, is as speculative an assumption as the contrary. In the event they do execute waivers, we think it likely that such would be motivated by a perceived or other economic advantage and that protection of the collateral would have been deliberately sacrificed. We are unpersuaded that we should undo, on behalf of a guarantor, what is more likely to have

been a considered exchange than is true in the case of the debtor.

*Id.*

Nor does a concern about the potential for abuse require a prohibition of all waivers. As several decisions have recognized, implicitly and explicitly, guarantors may be sufficiently protected by judicial scrutiny short of the imposition of a mandatory prophylactic rule. For example, in *United States v. Willis*, the Sixth Circuit did not read a prohibition on waivers by guarantors into § 9–501(3) but rather emphasized that a creditor can never avoid the "doctrine of commercial good faith." 593 F.2d at 255. In other words, the discretion conferred on the secured party by agreement is not boundless: "the powers conferred carry with them a duty to exercise them in a good faith attempt to maximize the proceeds of the sale." *Id.* Similarly, in *First National Park Bank v. Johnson*, 553 F.2d 599 (9th Cir.1977), the court upheld a guarantor's waiver of rights but implied that waiver does not confer unbridled discretion on the secured party. Writing for a unanimous Ninth Circuit panel, then-Judge Kennedy concluded that "[w]here a guaranty is unconditional, a creditor, *at least absent willful or grossly negligent waste or misconduct*, may recover a deficiency judgment from an unconditional guarantor without regard to the creditors' treatment of the collateral." 553 F.2d at 602 (emphasis added). *Cf. United States v. Lair*, 854 F.2d 233, 236–36 (7th Cir.1988) (guarantor will be released from liability under absolute guaranty only if Small Business Administration willfully caused deterioration, waste, or loss of collateral); *United States v. Andresen*, 583 F.Supp. 1084, 1086 (W.D.Va.1984) (absent showing of bad faith on part of creditor, language in guaranty waiving defenses based on subordination or release of collateral must be given effect).

■ In the present case, defendants offer no facts that would support an allegation of bad faith, misconduct, or grossly negligent waste in connection with the collateral sales. At most, defendants argue that the sales brought considerably less than the retail price of the automobiles

because Chrysler Motors established the floor prices to be received at the Fredericksburg Auto Auction, participation in the auction was limited to Chrysler dealerships, and bidding was restricted by cross-line buying.[14] But defendants concede that price differential alone is not sufficient to render a sale commercially unreasonable. *See* Va.Code § 8.9–507(2). *A fortiori*, price differential does not establish bad faith, abusive or grossly negligent conduct in collateral dispositions. UCC § 9–507(2) also establishes a conclusive presumption that if the secured party sells the collateral "in the usual manner in any recognized market therefore", then the sale is commercially reasonable. It is undisputed that the Chrysler Motors fleet auction is an established procedure, and that Fredericksburg Auto Auction is an established automobile auction. On essentially similar facts, several courts have suggested that such auctions are "recognized markets." *See, e.g., Ford Motor Credit Co. v. Solway*, 825 F.2d 1213, 1217 n. 2 (7th Cir.1987) (referring to district court conclusion that Arena Auto Auction was recognized market); *Ford Motor Credit Co. v. Devalk Lincoln–Mercury, Inc.*, 600 F.Supp. 1547, 1551 (N.D.Ill. 1985); *see also Contrail Leasing Partners, Ltd. v. Consolidated Airways, Inc.*, 742 F.2d 1095, 1101 (7th Cir.1984). In sum, there is no warrant here for disregarding defendants' voluntary pre-default waiver as the facts support no inference of bad faith, gross negligence or abusive behavior by Chrysler in connection with the disposition of the collateral.

In deciding that Virginia would give effect to guarantors' pre-default waivers of UCC § 9–504(3) rights, the Court essentially concludes that the Supreme Court of Virginia neither considered nor decided this issue in *Rhoten,* and if now faced with it would adhere to the well-established principle that in the absence of a statute directing otherwise, courts should not adopt an absolute bar that is in derogation of the freedom to contract and the principles of common law waiver. To adopt an absolute bar on waiver in this context inappropriately assumes a legislative role for courts. The question whether guarantors require pre-default protection, and if so what kind of protection, is a policy question more appropriately resolved, not in the litigation arena, but in the legislative forum where public policy considerations can be more thoroughly weighed and assessed.

### B. Vehicles for Consumer Purchase

■ Chrysler's third claim against the Curleys is based on the allegation that after the Dealership went out of business, various consumers defaulted on automobiles financed by Chrysler, and Chrysler sustained losses when it repossessed and disposed of their vehicles. The Curleys cite two grounds for partial summary judgment on this claim. First, the Curleys argue that, as a matter of contract interpretation, the Vehicle Financing and Repurchase Agreement entered into by Chrysler and the Dealership on June 23, 1987 (the "Agreement") limits Chrysler to recovery from a specified reserve account.[15] In particular, the Curleys point to the following language from section 3 of the Agreement:

> ... If you [Chrysler] desire to deliver a Repossessed Vehicle to us [the Dealership] and our place of business is closed or if we have ceased doing business, delivery shall be deemed to have been made if a demand for repurchase shall have been sent by you to us at our last known address by registered or certified mail. If delivery of the Vehicle is not made or tendered as aforesaid with respect to a Contract in default, then we will have no obligation to repurchase the Vehicle but we do agree to pay to you the related Contract Reserve to the extent of your loss.

---

**14.** This procedure apparently restricts dealerships to purchasing only automobiles of their own brand. For example, a Chrysler dealership may not buy a Dodge automobile, and a Dodge dealership may not buy a Plymouth automobile.

**15.** Sections 1 and 2 of the Agreement specify the nature of the Contract Reserve. The parties dispute whether Chrysler or the Dealership was obligated to maintain the Reserve at a certain level. The Court does not reach this dispute because it finds that Chrysler may recover from the defendants directly under the Guaranty.

Citing Va.Code § 8.9–504(3), the Curleys also contend that they cannot be liable because they did not receive notice of the dispositions.

The Curleys' notice argument is meritless for the same reason explained above with respect to the notice of auction sale. By executing the Guaranty, the Curleys agreed to guaranty all indebtedness of the Dealership and to waive all forms of notice. As to the Agreement, Chrysler advances a number of arguments. The Court need not consider every argument, as two are dispositive in favor of Chrysler. First, the Agreement does not displace the Guaranty; it does not impair Chrysler's Guaranty rights, which include the right to seek recovery directly from the guarantors without having to act first against the principal debtor, the Dealership.[16] Further, the Agreement was entered into by the Dealership, not the Curleys. It thus only controls Chrysler's recovery against the debtor; it does not bar Chrysler's direct action under the Guaranty.[17] In particular, the Guaranty provides that the defendants unconditionally waived "any steps whatsoever to make demand upon or to collect from" the Dealership and that defendants agreed that "the making of a demand, or absence of demand, for payment" of any indebtedness would not impair their liability. Guaranty ¶¶ 3(a), 4(f). As quoted above, the Agreement states that should the Dealership be closed, delivery is to be effected by means of a written "demand for repurchase". This demand clearly constitutes the type of demand for payment contemplated by the Guaranty. Consequently, while the Dealership was entitled to a demand under the Agreement, the defendant-guarantors waived any demand on the Dealership as a defense to their own liability.

More generally, the fundamental purpose of the Guaranty is to enable Chrysler to seek recovery directly from the guarantors. To limit the secured party's recovery to a form of action against the debtor would render unconditional guaranties meaningless, a point implicit in the many decisions upholding the validity of absolute guaranties. *See, e.g., United States v. Southern Cycle Accessories, Inc.,* 567 F.2d 296, 298 (5th Cir.1978) (guarantor's unconditional agreement to pay debt in case of default may be enforced separately from primary obligation and without necessity of proceeding against primary debtor); *Phillips Factors Corp. v. Harbor Lane of Pensacola, Inc.,* 648 F.Supp. 1580, 1583–84 (M.D.N.C.1986) (guaranty of payment is an absolute promise by guarantor to pay debt when due if it is not paid by debtor); *United States v. Houff,* 202 F.Supp. 471 (W.D.Va.1962) (fact that Small Business Administration had not resorted to security before suing guarantors of loan was no defense to guarantors where guaranty was absolute and did not require SBA to pursue rights against borrower before asserting rights under guaranty), *aff'd,* 312 F.2d 6 (4th Cir.1962); *see generally* 38 C.J.S. Guaranty § 61 (where guaranty is absolute, as in case of guaranty of payment, guarantor is bound immediately upon failure of debtor, and no steps need be taken against debtor before suit against guarantor).

Quite apart from the Guaranty, the repurchase procedure set forth in the Agreement was not Chrysler's sole means of recovery with respect to defaults on vehicles financed for consumers. Rather, the Agreement was only an alternative course of action available to Chrysler because each "Retail Installment Contract" governing the purchase of a vehicle by a consumer incorporated an assignment agreement between the Dealership and Chrysler. Un-

---

**16.** Paragraph 3 of the Guaranty states in part that "[t]his is a guaranty of payment, and not of collection, and Guarantor therefore agrees that the Lender shall not be obligated prior to seeking recourse against or receiving payment from Guarantor, to take any action whatsoever against Debtor. . . ."

**17.** A related point is that Chrysler and the Dealership entered into the Agreement several months after the execution of the Guaranty. The Curleys therefore did not rely on the Agreement as a means of protection against their own liability at the time they agreed to become guarantors.

der Va.Code § 8.9–502(2),[18] this assignment relationship rendered the Dealership liable for any deficiency resulting from Chrysler's attempts to collect from defaulting purchasers. Thus, as an alternative to having the Dealership repurchase vehicles, Chrysler could take the more laborious route of first attempting to collect from purchasers pursuant to the underlying individual installment contracts and then holding the Dealership liable for any deficiency. To elaborate in somewhat more detail, under each retail contract the Dealership agreed to sell a vehicle to a buyer for an initial down payment plus the balance to be paid in installments over time. The Dealership thus obtained a security interest in the vehicle. Each security interest was in turn assigned to Chrysler by the terms of an assignment spelled out on the second page of the retail contract. These assignments, *inter alia*, authorized Chrysler to "do every act and thing necessary to collect and discharge obligations arising out of or incident to this contract and assignment." The Dealership assigned its security interests to Chrysler as security for the debt owed by the Dealership under the Agreement. Thus, under § 8.9–502(2), the Dealership rendered itself liable for any amount (deficiency) that Chrysler might be unable to recover from the vehicle purchasers.

The nature of the repurchase procedure as an alternative, rather than an exclusive, course of action is reflected in the language of the Agreement. To begin with, the Agreement in no way suggests that it provides the entire agreement of the parties with respect to vehicles financed for consumer purchase. Thus, paragraph seven states that the Agreement "is supple-

mental to [the Dealership's] obligations contained in the assignment and endorsement of each Contract assigned to [Chrysler]." The language also suggests that Chrysler was not bound to offer repossessed vehicles to the Dealership for repurchase. For example, paragraph 3 of the Agreement states that the Dealership agrees to repurchase contracts or vehicles "*if* you [Chrysler] shall have repossessed the Vehicle ... and delivered or tendered delivery of the Repossessed Vehicle to us [the Dealership]." (emphasis added). The procedure to be followed if the Dealership is closed is prefaced with the language "*if* you desire to deliver a Repossessed Vehicle to us" (emphasis added). Moreover, nothing in the Agreement denies the Dealership's liability for any deficiency owed to Chrysler under § 8.9–502(2). In sum, under the Agreement Chrysler obtained a more efficient means of enforcing the Dealership's debt obligation and collecting on repossessed vehicles, while the Dealership had the opportunity to minimize its liability through the repurchase and retail sale of repossessed vehicles. Chrysler did not, however, abandon the statutory right to repossess vehicles in its capacity as assignee, sell them, and hold the debtor, and thus the defendants as guarantors, liable for the deficiency.

Accordingly, because Chrysler may recover from defendants either directly through the Guaranty or by way of a deficiency, defendants' motion for partial summary judgment must be denied. Similarly, because defendants waived their UCC § 9–504(3) rights and are liable for the indebtedness of the Dealership, plaintiff's motion for summary judgment must be

---

**18.** UCC § 9–502(2) enables a secured party who is an assignee of accounts, chattel paper, contract rights or instruments to make direct collection from the account debtor or obligor upon the principal debtor's default. *See* 69 Am. Jur.2d, Secured Transactions § 580 (1973). By its terms, however, the section is not restricted to instances where the debtor has defaulted. Section 9–502(1) states that the secured party may also pursue the account debtor "when so agreed" between the debtor and secured party. Va.Code § 8.9–502(2) states in pertinent part "A secured party who by agreement is entitled to charge back uncollected collateral or otherwise

to full or limited recourse against the debtor and who undertakes to collect from the account debtors or obligors must proceed in a commercially reasonable manner and may deduct his reasonable expenses of realization from the collections. If the security agreement secures an indebtedness, the secured party must account to the debtor for any surplus, *and unless otherwise agreed, the debtor is liable for any deficiency.*" (emphasis added) For a partial illustration of the relationships discussed here, see paragraph four of the Official Comment to Va.Code § 8.9–105.

granted. Chrysler is thus entitled to a judgment in the principal amount of $82,-374.84 for the vehicles sold out of trust, $105,722.08 for losses sustained in the repossession and sale of the Dealership's assets, and $124,059.17 for losses incurred in the repossession and sale of vehicles financed for consumer purchasers, for a total of $312,156.09.[19]

An appropriate Order shall issue.

---

**19.** This aggregate amount reflects the parties' Stipulation of Facts. Not yet resolved is whether Chrysler is entitled to any additional moneys from the Contract Reserve established by the Vehicle Financing and Repurchase Agreement. Further oral argument on this issue will be held at 12:00 p.m. on Friday, January 18, 1991.